CITY OF PHILADELPHIA and City of Detroit, Plaintiffs,

v.

CHAS. PFIZER & CO., Inc., et al., Defendants.

FORT PIERCE MEMORIAL HOSPITAL, and Deborah Hospital on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CHAS. PFIZER & CO., Inc., et al., Defendants.

HAVERFORD HOSPITAL CORPORATION et al., Plaintiffs,

v.

CHAS. PFIZER & CO., Inc., et al., Defendants.

Nos. 68 Civ. 4298, 68 Civ. 4299, 69 Civ. 4629.

United States District Court, S. D. New York.

May 31, 1972.

Harold E. Kohn, Philadelphia, Pa., for petitioners; Harold E. Kohn, P. A., David Berger, David Berger, P. A., Philadelphia, Pa., of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Chas. Pfizer & Co., Inc.; J. Paul McGrath, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant American Cyanamid Co.; Roy W. McDonald, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant Bristol-Myers Co.; Merrell E. Clark, Jr., New York City, of counsel.

WYATT, District Judge.

This is a petition by Harold E. Kohn (and by other counsel associated with him), attorney for plaintiffs in these class actions, for an order approving a fee of $2,000,000, to be paid by defendants to Kohn and his associates. The petition is undated but was submitted in open Court on January 24, 1972 in the presence of counsel for defendants and was at that time ordered by me to be filed and docketed. Mr. Kohn and counsel for defendants were heard on that occasion. Decision on the petition was reserved.

Mr. Kohn is an experienced lawyer in antitrust matters; his office is in Philadelphia. He personally took the active part amongst the petitioners; he and his associate, Miss Korman (one of the petitioners) are known to me from their

appearances before me; the other petitioners are not known to me and I am not personally aware of any relevant activity by them.

A "Supplement to Petition", also undated, was thereafter mailed to the Clerk and was received for filing on February 14, 1972.

The caption of the petition shows three civil actions in which Kohn represents the plaintiffs. Apparently, notice of the petition was given to defendants only. When the petition was heard, only defendants were represented and had been notified.

I. Commencement of the Actions Now Being Settled

A. Commencement of Actions Before Verdict in the Criminal Case

The extensive background of these three class actions and many similar actions need not be here reviewed in detail. It is described in my opinions in State of West Virginia v. Chas. Pfizer & Co., D.C., 314 F.Supp. 710, affirmed 2 Cir., 440 F.2d 1079 and in Hartford Hospital v. Chas. Pfizer & Co., D.C., 52 F.R.D. 131 (see on appeal from denial of motion to intervene, American Hospital Assn. v. Chas. Pfizer & Co., 2 Cir., 448 F.2d 790).

For present purposes, the history may begin with the filing on August 17, 1961 of an indictment in this District naming Pfizer, Cyanamid and Bristol as defendants (61 Cr. 772) along with some individuals, whose motions to dismiss were subsequently granted (United States v. Chas. Pfizer & Co., D.C., 245 F.Supp. 801). The indictment charged violation of the antitrust laws in respect of broad spectrum antibiotic drugs. It was some time before any civil claim was asserted against defendants. In time, however, many similar civil actions were commenced. All of these actions not commenced in this District were transferred here by the Judicial Panel on Multidistrict Litigation.

1.

In 1963, Premo Pharmaceutical Corporation (Premo), a drug business operating from New Jersey, began to import tetracycline from Italy. Pfizer on September 20, 1963 commenced an action for patent infringement against Premo in the United States District Court for the District of New Jersey (C.A. 766–63). Premo filed in that action a counterclaim asserting violation by Pfizer of the antitrust laws. Premo then retained a lawyer, Dennis, to assist patent counsel in prosecuting the counterclaim.

2.

In the following year, 1964, Premo was low bidder for sales of tetracycline to the City of New York but, since Pfizer had threatened the City with a patent infringement suit if it bought from Premo, the City in buying from Premo required Premo to post an indemnity bond. By this time, Dennis had become a partner in the law firm of Dickstein, Shapiro & Galligan. Premo consulted this firm in connection with the furnishing of the indemnity bond to the City.

In June 1964, Pfizer commenced an action in this Court against the City of New York and against the surety on Premo's indemnity bond; the complaint alleged infringement of the Conover patent. This is an action still pending (64 Civ. 1742).

The defendant City of New York retained as its counsel Dickstein, Shapiro & Galligan; on July 1, 1964, these lawyers filed an answer. This answer contained a counterclaim asserting a cause of action for treble damages against Pfizer, Cyanamid, Bristol, Squibb and Upjohn for violation of the antitrust laws. The counterclaim was based on the charges in the indictment and in substantial part is word for word copied from the indictment. The counterclaim did not set out any claim for a class. Mr. Shapiro and Mr. Galligan have not only been active in the City of

New York action but, as will appear, have been active in many other actions involving antibiotic antitrust claims.

### 3.

It was some time before any claim similar to that of the City of New York was asserted against defendants. (On July 13, 1964, Premo commenced an action in this Court (64 Civ. 2163) against the defendants other than Pfizer.)

In November 1966, the Shapiro firm negotiated a settlement of the Premo litigation. A chief feature of the settlement was a license by Pfizer to Premo and two other companies to make, sell, etc. tetracycline. This license, according to Shapiro and as agreed implicitly by all other counsel for plaintiffs, marked the end of the claimed antitrust law violations.

### 4.

On August 4, 1967, the State of Texas commenced an action in the Northern District of Texas (CA 3–2165; after transfer here, 68 Civ. 4375). The Shapiro firm was of counsel. This was the first action commenced by a plaintiff to assert treble damage antitrust claims against defendants. It was a class action for the State of Texas and all cities, counties, and other political subdivisions in Texas which had bought antibiotics during the relevant period. (City, county, and state entities are, in the context of these actions, often called "CCS" entities and the actions are often called "CCS" actions.)

### 5.

In August 1967, Pfizer commenced a patent infringement action in the Central District of California (67–793–R; after transfer here, 68 Civ. 4541) against Benalen Corporation, a wholesale drug house. On August 24, 1967, Benalen filed an answer with a counterclaim for violation of the antitrust laws. The counterclaim as then filed did not state a claim for a class. On September 18, 1967, Benalen filed an amended counter-claim which did assert the antitrust claim for a class of all drug wholesalers in California who had bought and resold antibiotics at wholesale in the relevant period. This was the first civil antitrust claim asserted against defendants by a wholesale druggist. Counsel for Benalen have been Schwartz & Alschuler, for whom Benjamin F. Schwartz and Herbert A. Karzen have been principally engaged.

### 6.

On September 18, 1967, Domaro, a California retail druggist, commenced an action against defendants in the Central District of California (67–1366–R; after transfer here, 68 Civ. 4542). The Schwartz firm represented Domaro. The claim was stated for a class of all retail druggists in California who bought and resold antibiotics at retail in the relevant period. This was the first civil antitrust claim asserted against defendants by a retail drug store.

### 7.

On September 18, 1967, American Medical Enterprises, which had hospitals in California, commenced an action against defendants in the Central District of California (67–1365–R; after transfer here, 68 Civ. 4543). The Schwartz firm represented American Medical Enterprises. The claim was stated for a class of all private hospitals in California who bought and resold or dispensed antibiotics to their patients in the relevant period. This was the first civil antitrust claim asserted against defendants by a private hospital.

### 8.

On October 23, 1967, trial of the indictment began in this Court before Judge Frankel.

On October 25, 1967, the State of Florida commenced an action in this Court (67 Civ. 4143). The Shapiro firm was of counsel. The claim was for a class of all CCS entities in Florida which had bought antibiotics during the

relevant period or had paid for antibiotics under welfare, old age or other relief programs.

On December 29, 1967, the jury brought in a verdict of guilty against the three defendants named in the indictment.

B. Commencement of Actions After Verdict in the Criminal Case Until the February 6, 1969 Settlement Offers of Defendants

9.

On January 9, 1968, the State of Wisconsin commenced an action in this Court (68 Civ. 91). The Shapiro firm was of counsel. The claim was for a class of all CCS entities in Wisconsin (including all entities supported in whole or part by state or local government funds) which had bought antibiotics during the relevant period or had paid for antibiotics under any welfare program.

10.

On January 17, 1968, the State of Iowa commenced an action in the Southern District of Iowa (8–2130–C–2; after transfer here, 68 Civ. 4297). The attorneys for Iowa were the Attorney General and two of his assistants. (After January 6, 1969, Iowa was represented by the Shapiro firm which filed a notice of appearance on that date.) No claim for a class was stated. Iowa claimed damages as a result of purchases of antibiotics by its universities, mental and other hospitals, and correctional institutions.

11.

On January 18, 1968, the City of Philadelphia and the City of Detroit commenced an action in the Eastern District of Pennsylvania (68–144; after transfer here, 68 Civ. 4298). The names of five individual attorneys, apparently all in private practice in Philadelphia, were first typed at the end of the complaint: Berger, Newberg, Montague, Schambelan, and Kohn in that order, described as "Special Counsel for Plaintiffs City of Philadelphia and City of Detroit". Then followed the names of the City Solicitor of Philadelphia and of the Corporation Counsel and Chief Assistant Corporation Counsel of the City of Detroit. The only signature (manual) was that of Berger (Fed.R. Civ.P. 11). The naming of Kohn at the end of the complaint was his first recorded appearance on the scene; it was also the first such appearance of the others named. The claim was stated for a class of "all state and municipal governments, . . . agencies, authorities . . . in the United States" which had purchased antibiotics in the relevant period. It should be noted that this is the *first* assertion of a claim on behalf of a *national* class of CCS entities. Why the City of Detroit commenced an action in the Eastern District of Pennsylvania is puzzling. It would seem logical for Detroit to have commenced an action in the federal district court in Detroit. It would also seem logical for Detroit to have commenced an action in this Court; the indictment had been returned here, records and other data had been collected here, the first civil claim had been made here, and four of the five defendants had their principal offices here. The choice by the City of Detroit of the Eastern District of Pennsylvania is hard to explain; it must have been made for the reason that the Eastern District of Pennsylvania was the most convenient forum for the Philadelphia lawyers.

12.

On January 19, 1968, the State of West Virginia commenced an action in this Court (68 Civ. 240). The Shapiro firm was of counsel, as was also Lee A. Freeman, Esq. of Chicago, who (as will appear) became active in many actions against defendants. The claim was stated for a class not only of CCS entities in West Virginia but of "all cities, counties, municipal and public corporations throughout the United States" which had bought antibiotics during the relevant period or had paid

for antibiotics under any welfare program. It should be noted that this is the *second* assertion of a claim on behalf of a *national* class of CCS entities.

### 13.

On January 22, 1968, the State of Illinois commenced an action in this Court (68 Civ. 273). Freeman was of counsel, as was also the Shapiro firm. The claim was for a class of all CCS entities in Illinois and was stated in substantially the same words as the Wisconsin claim.

### 14.

On February 6, 1968, Cotler Drugs, Inc. commenced an action in the Northern District of Illinois (68 C 220; after transfer here, 68 Civ. 4322). The attorneys for plaintiffs were Lawrence Walner, Edward A. Berman, and others. The claim was for a class of "all retail drug stores in the United States" which had bought antibiotics in the relevant period. It should be noted that this is the *first* assertion of a claim on behalf of a *national* class of retail drug stores.

### 15.

On February 7, 1968, the City of Boston commenced an action in the District of Massachusetts (68–105–G; after transfer here, 68 Civ. 4354). The attorneys for plaintiffs were the Corporation Counsel of Boston and Leo Schwartz, Esq., apparently a lawyer in private practice. No claim as stated for a class. Boston sued as a purchaser of antibiotics.

### 16.

On February 8, 1968, Massachusetts commenced an action in the District of Massachusetts (68–116–G; after transfer here, 68 Civ. 4355). The names of the Attorney General and of one of his Assistants appeared on the complaint as attorneys for Massachusetts, but the complaint was evidently drafted by the Shapiro firm (and that firm on June 11, 1968 filed a "notice of appearance" in the action). The claim stated was for a class of all CCS entities in Massachusetts, except the City of Boston, which had bought antibiotics during the relevant period. Evidently it had been arranged that Massachusetts and Boston would bring separate actions, although neither the necessity nor the advantage in such duplication is easy to see.

### 17.

On February 13, 1968, a motion of the County of Erie, New York, for leave to intervene as a plaintiff in the City of Philadelphia action (see (11) above) was filed in that action. No order on this motion was made until after February 6, 1969.

### 18.

On February 23, 1968, Minnesota commenced an action in this Court (68 Civ. 735). The names of the Attorney General, of a Special Assistant, and of Irving Younger (then a member of the Bar of this Court and of New York and now a judge of the Civil Court) appeared on the complaint. The Shapiro firm filed a "notice of appearance" on February 26, 1968 which had been dated and served on February 23, 1968, the same day on which the complaint was filed. The claim was for a class of all CCS entities in Minnesota.

### 19.

On February 28, 1968, Fort Pierce Memorial Hospital (of Fort Pierce, Florida) commenced an action in the Eastern District of Pennsylvania (68–452; after transfer here, 68 Civ. 4299). The same individual Philadelphia attorneys, who had been named in the City of Philadelphia action described above, were listed as attorneys for plaintiff hospital at the end of the complaint: Berger, Newberg, Montague, Schambelan and Kohn in that order. The only signature (manual) was that of Berger. The claim was stated for a class of all non-profit hospitals in the United States. It should be noted (a) that this is the *first* assertion of a claim on behalf of a *national* class of private

hospitals and (b) that the class did not include proprietary hospitals (that is, those operated for profit). Why a hospital in Florida should commence an action in the Eastern District of Pennsylvania is puzzling for the same reasons as indicated in (11) above.

20.

On February 29, 1968, the State of New York commenced an action in this Court (68 Civ. 845). The names of the Attorney General and of three of his Assistants appeared on the complaint as attorneys for New York; apparently no outside attorney has been employed by New York. No claim for a class was stated. New York sued as a purchaser of antibiotics "for its state hospitals, state institutions and related tax-supported agencies" and as having paid for antibiotics under various welfare programs.

21.

On March 15, 1968, Alabama commenced an action in this Court (68 Civ. 1099). The Shapiro firm was of counsel. The claim was for a class of all CCS entities in Alabama.

22.

On March 26, 1968, Pennsylvania commenced an action in this Court (68 Civ. 1212). The names of the Attorney General and of Freeman appeared on the complaint. The Shapiro firm was also named of counsel. The claim was for a class of all city, county and public hospitals in Pennsylvania, except city hospitals in the City of Philadelphia.

23.

Three actions were then commenced in this Court on the dates, by the States, and with the file numbers indicated:

| | | |
|---|---|---|
| April 4, 1968 | Louisiana | 68 Civ. 1380 |
| April 22, 1968 | Mississippi | 68 Civ. 1625 |
| April 22, 1968 | North Dakota | 68 Civ. 1626 |

The Shapiro firm was of counsel in each action. The claim in each action was for a class of all CCS entities in the plaintiff state.

24.

On April 25, 1968, Maryland commenced an action in the Northern District of Illinois (68 C 757; after transfer here, 68 Civ. 4324). The names at the end of the complaint were those of the Attorney General, of William L. Siskind (apparently a lawyer in private practice in Baltimore), and of Granvil I. Specks, Sheldon O. Collen, and Perry Goldberg (three lawyers in Chicago, of whom Specks and Goldberg have been active in this and other actions). The only signature (manual) was that of Goldberg. There was no claim for a class. Maryland sued as a purchaser of antibiotics. Why the State of Maryland should have commenced an action in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

25.

On the same day—April 25, 1968—the City of Baltimore also commenced an action in the Northern District of Illinois (68 C 758; after transfer here, 68 Civ. 4325). The names at the end of the complaint were those of the City Solicitor, of Siskind and of another Baltimore lawyer, and of the three Chicago lawyers: Specks, Collen, and Goldberg. The only signature (manual) was that of Goldberg. There was no claim for a class. Baltimore sued as a purchaser of antibiotics. Why Baltimore should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above. Moreover, it is not easy to see why separate and duplicating actions should have been brought by Maryland and by Baltimore; except for the names of the plaintiffs, the complaints in the two actions are word for word the same.

26.

On May 2, 1968, the City of Memphis commenced an action in this Court (68 Civ. 1807). The Shapiro firm was of

counsel. No claim for a class was stated. Memphis sued as a purchaser of antibiotics.

### 27.

On May 6, 1968, New Mexico commenced an action in the Northern District of Illinois (68 C 822; after transfer here, 68 Civ. 4326). The names on the complaint were those of the Attorney General, of a lawyer in Albuquerque, and of the three Chicago lawyers: Specks, Collen, and Goldberg. There was no signature (manual) to the complaint (Fed. R.Civ.P. 11), apparently by inadvertence. The claim was for a class of "all purchasers of broad spectrum antibiotics . . . in the State of New Mexico." It should be noted that this is the *first* assertion of a claim on behalf of a class broad enough to include *consumers*, those who are end users. Why New Mexico should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

### 28.

On May 17, 1968, Ohio commenced an action in this Court (68 Civ. 2019). The Shapiro firm was of counsel. The claim was for a class of all CCS entities in Ohio.

It should be noted at this point that the Judicial Panel on Multidistrict Litigation was appointed by the Chief Justice on May 31, 1968 (44 F.R.D. 389); the law had become effective on April 29, 1968 (28 U.S.C. § 1407).

### 29.

On June 25, 1968, Connecticut commenced an action in the Northern District of Illinois (68 C 1181; after transfer here, 68 Civ. 4323). The names on the complaint were those of the Attorney General, of a lawyer in Hartford (apparently in private practice), and of the three Chicago lawyers: Specks, Collen, and Goldberg. There was no signature (manual). No claim for a class was stated. Connecticut sued as a purchaser of antibiotics. Why Connecticut should have sued in the Northern District of Illinois is puzzling for the same reasons indicated in (11) above.

### 30.

On August 2, 1968, Indiana commenced an action in this Court (68 Civ. 3157). The complaint was signed (manually) by the Attorney General, by one of his assistants, by another person (apparently a lawyer in private practice), and by Freeman; it was also signed (manually) by Shapiro and the Shapiro firm was listed "of counsel". Indiana sued not only on its own behalf as a purchaser of antibiotics but also for a class of "all city, county and public hospitals" in Indiana.

### 31.

On August 8, 1968, the City and County of Denver commenced an action in the Northern District of Illinois (68 C 1478; after transfer here, 68 Civ. 4930). The names on the complaint were those of the City Attorney, of a lawyer and a law firm in Denver (apparently in private practice), and of the three Chicago lawyers: Specks, Collen, and Goldberg. The signature (manual) was by Specks. There was no claim for a class. The City and County of Denver sued as purchasers of antibiotics. Why the City and County of Denver should have sued in the Northern District of Illinois is puzzling for the same reasons indicated in (11) above.

### 32.

On August 15, 1968, Richardson Drug Co., Inc. and ten other retail drug stores in Massachusetts commenced an action in the District of Massachusetts (68–744–G; after transfer here, 68 Civ. 4537). The complaint was signed (manually) by Leo Schwartz and by Zamparelli and White, lawyers in private practice in Boston. The claim was for a class of retail druggists in Massachusetts (said to number about 6000) and of retail druggists "throughout the United States" (said to number about 100,000).

### 33.

On August 22, 1968, New Jersey commenced an action in the Northern District of Illinois (68 C 1564; after transfer here, 68 Civ. 4929). The names on the complaint were those of the Attorney General, of his First Assistant, and of the three Chicago lawyers: Specks, Collen, and Goldberg. The signature (manual) was by Goldberg. The claim was for a class of all "governmental purchasers" of antibiotics in New Jersey. Why New Jersey should have sued in the Northern District of Illinois is puzzling for the same reasons indicated in (11) above.

### 34.

On September 12, 1968, Ford Hopkins Company and Stineway Drug Company, two wholesale druggists (apparently in Illinois), nine retail drug stores in Illinois owned by them, and nine retail drug stores in Illinois independently owned, commenced an action in the Northern District of Illinois (68 C 1698; after transfer here, 68 Civ. 4931). The complaint was signed (manually) by Freeman and by Richard F. Levy (of the firm of Levy & Erens). (Mr. Freeman, by order filed April 11, 1969, was allowed to withdraw as an attorney for plaintiffs.) The claim was for a class of all "retail drug stores in the United States".

### 35.

On September 19, 1968, Associated Hospital Service of New York and twenty-four private hospitals in New York commenced an action in this Court (68 Civ. 3763). The name of Breed, Abbott & Morgan was on the complaint and the signature (manual) was by Bagdasarian. The claim was for a class of all private hospitals in New York and of "all hospital service corporations" in New York.

### 36.

On September 30, 1968, Cedars of Lebanon Hospital, a private hospital in Miami, commenced an action in the Southern District of Florida (68–1131; after transfer here, 69 Civ. 1637). The name of Kelly, Black, Black & Kenny was on the complaint and the signature (manual) was by Michael Nachwalter. The claim was for a class of all private hospitals in Florida.

### 37.

On October 21, 1968, Alpine Pharmacy, Inc., a retail drug store in Illinois, and another retail drug store in that State, commenced an action in the Northern District of Illinois (68 C 1952; after transfer here, 69 Civ. 559). The complaint was signed (manually) by Jerome S. Wald, a Chicago lawyer. The claim was for a class of all "independent retail druggists" in the United States.

On October 21, 1968, the Judicial Panel on Multidistrict Litigation transferred all the then pending antibiotic antitrust actions (or all those of which the Panel was then aware) to this District for pretrial purposes (Antibiotic Drugs, In re Jud.Pan.Mult.Lit., 295 F.Supp. 1402).

### 38.

On October 24, 1968, Lee's Prescription Shops, Inc. (operating retail drug stores in Florida), Plantation General Hospital, Inc., and North Miami General Hospital, Inc. (two private hospitals in Florida) commenced an action in the Southern District of Florida (68–1224; after transfer here, 69 Civ. 1638). The name of Sager, Silverman & Bodne was on the complaint and the signature (manual) was by Silverman. The claim was said to be for a class of "all persons, businesses, institutions or other entities whose activities require that they purchase" antibiotics for resale "through pharmacies or dispensaries to the public at the direction or order of licensed physicians". This language is not very clear but it seems to refer to retail drug stores selling antibiotics against prescriptions. In the complaint is also an "alternative designation of class action", in which the two hospital plaintiffs state that they represent "all hospitals so similarly situated" and the drug store plain-

tiff states that it represents "all pharmacies so similarly situated".

### 39.

On October 28, 1968, South Dakota commenced an action in the District of South Dakota (68–104C; after transfer here, 69 Civ. 205). The names on the complaint were those of the Attorney General and two Special Assistants; at some point (probably after transfer of the action here) the Shapiro firm became of counsel for South Dakota. The claim was for a class of all CCS entities in South Dakota.

### 40.

On October 30, 1968, Lee's Prescription Shops, Inc., Plantation General Hospital, Inc., and North Miami General Hospital, Inc. caused a summons to be issued out of the Circuit Court of the Eleventh Judicial Circuit of Florida in Dade County. Their complaint had apparently been filed on the same day. The name of Sager, Silverman & Bodne was on the complaint and apparently there was a manual signature by Silverman. The claim was based on Florida statutes and "the common law against trusts in restraint of trade". The claim was for the same class and had the same "alternative designation of class action" as in the action commenced by the same plaintiffs a few days earlier in the federal court in Florida and described in (38) above. The defendants promptly removed the action (for diversity of citizenship) from the state court to the federal court in Florida (where its file number became 68–1340; after transfer here, 69 Civ. 1639).

### 41.

On November 12, 1968, Kentucky commenced an action in this Court (68 Civ. 4453). The Shapiro firm was of counsel. The claim was for a class of all CCS entities in Kentucky; also as parens patriae for "all individual consumers" in Kentucky; also for a class of "all individual consumers" in Kentucky. It should be noted that this is the *first* assertion of a *parens patriae claim*, also the *first* assertion of a claim *for a class of "individual consumers"* (reference is made to (27) above and to the broad class described in the New Mexico action). Complaints in actions commenced after that of Kentucky generally stated claims for a class of consumers; complaints in the earlier actions were amended (after the February 6, 1969 offers) to state such claims.

### 42.

On December 6, 1968, New Hampshire commenced an action in this Court (68 Civ. 4878). The complaint was signed (manually) by the Attorney General and by Freeman; it was also signed (manually) by Shapiro and the Shapiro firm was listed "of counsel". New Hampshire sued not only for itself but for a class of "all city, county and public hospitals" in New Hampshire; also as parens patriae for "all individual consumers" in New Hampshire; also for a class of "all individual consumers" in New Hampshire.

### 43.

On December 9, 1968, Jackson Hospital and Clinic, Inc. (a private non-profit hospital in Montgomery, Alabama) and Professional Center, Inc. (a private proprietary hospital in Montgomery, Alabama) commenced an action in the Middle District of Alabama (2809–N; after transfer here, 69 Civ. 1480). The names of Steiner, Crum & Baker and of Carl W. Bear were on the complaint as attorneys for plaintiffs; there were manual signatures of four attorneys. The claim was stated for a class of all private non-profit hospitals in Alabama and for a second class of all private proprietary hospitals in Alabama.

### 44.

On December 13, 1968, Hospital Service Corporation of Rhode Island (a non-profit hospital service corporation in Rhode Island) and ten private hospitals in Rhode Island commenced an action in this Court (68 Civ. 4971). Breed, Abbott & Morgan were shown on the complaint as attorneys for plaintiffs; the

manual signature was that of Robert J. Bagdasarian. The claim was stated for a class of all hospitals in Rhode Island "not operated by the local, state or federal government" (this would seem to include all private hospitals, non-profit and proprietary) and Hospital Service Corporation of Rhode Island, which was said to have reimbursed hospitals for their purchases of antibiotics.

### 45.

On December 20, 1968, Arkansas commenced an action in the Eastern District of Arkansas (LR 68 C 254; after transfer here, 69 Civ. 778). The complaint was signed (manually) by the Attorney General of Arkansas and by two of his Assistants. The claim was stated to be as parens patriae for all "individual consumers" in Arkansas and for a class of all CCS entities in Arkansas and "all individual consumers" within that State.

### 46.

On December 23, 1968, The County of Maricopa (Arizona) commenced an action in the District of Arizona (Civ. 6961; after transfer here, 69 Civ. 1698). Harrison, Strick & Myers were named as attorneys for plaintiff; the manual signature was that of Mark I. Harrison. The claim was stated for a class of all CCS entities in Arizona.

### 47.

On December 23, 1968, Oklahoma commenced an action in this Court (68 Civ. 5096). The complaint was signed (manually) by the Attorney General, by a Special Counsel in Oklahoma, and by Shapiro; the Shapiro firm was stated to be of counsel. The claim was stated to be as parens patriae for all "individual consumers" in Oklahoma and for a class of all CCS entities in Oklahoma and "all individual consumers" within that State.

### 48.

On December 23, 1968, Rhode Island commenced an action in this Court (68 Civ. 5112). The complaint was signed (manually) by the Attorney General of Rhode Island, by one of his Assistants, and by Shapiro; the Shapiro firm was stated to be of counsel. The claim was stated to be as parens patriae for all "individual consumers" in Rhode Island and for a class of all CCS entities in Rhode Island and "all individual consumers" within that State.

### 49.

On December 23, 1968, the Commonwealth of Puerto Rico commenced an action in the District of Puerto Rico (869–68; after transfer here, 69 Civ. 806). The complaint was signed (manually) by the Attorney General of Puerto Rico, by one of his Assistants, by an attorney in the Department of Justice, and by Robert E. Sher (an attorney in Washington, D. C.). The claim was stated for a class of CCS entities in Puerto Rico and of "all individual consumers" there.

### 50.

Under date of December 24, 1968, Berger and Montague—two lawyers associated with Kohn—wrote to the Clerk of this Court, enclosing motion of the Cities of Cleveland and Akron, Ohio, and a separate motion of the State of Delaware for leave to intervene as plaintiffs in the City of Philadelphia action (see (11) above). No order on either motion was made until after February 6, 1969.

### 51.

On December 26, 1968, Arizona Foundation for Neurology and Psychiatry and eight other private hospitals in Arizona commenced an action in the District of Arizona (Civ. 6967; after transfer here, 69 Civ. 1697). The complaint showed Sullivan and Mahoney and Harrison, Strick & Myers as attorneys for plaintiffs; the manual signature was by William P. Mahoney, Jr. The claim was stated for a class of all private hospitals in Arizona.

### 52.

On December 26, 1968, Virginia commenced an action in this Court (68 Civ.

**464**

5140). The complaint was signed (manually) by the Attorney General of Virginia, by two of his Assistants, and by Shapiro; the Shapiro firm was stated to be of counsel. The claim was stated to be as parens patriae for all "individual consumers" in Virginia and for a class of all CCS entities in Virginia and "all individual consumers" within that State.

### 53.

On December 26, 1968, Colorado commenced an action in this Court (68 Civ. 5141). The complaint was signed (manually) by the Attorney General of Colorado, by his Deputy, by Freeman (as Special Assistant Attorney General), and by Galligan (of the Shapiro firm). The claim was stated to be as parens patriae for "all individual consumers" in Colorado and for a class of all city, county and public hospitals in Colorado and for another class of "all individual consumers" in that State.

### 54.

On December 27, 1968, DeKoven Drug Co., Inc. and ten others named as plaintiffs commenced an action in the Northern District of Illinois (68 C 2478; after transfer here, 69 Civ. 896). Presumably the plaintiffs were all engaged in the wholesale or retail selling of drugs but no description of their business was given. There are no manual signatures to the complaint (Fed.R.Civ.P. 11). At the end of the complaint appear the names of James P. Chapman and James B. Sloan, with addresses in Chicago. The claim is not specifically stated to be for a class but plaintiffs are stated to sue as representative "of all other persons in the United States of America similarly situated" and it is assumed that a class action was intended. Since it is not stated how "situated" the plaintiffs were, it is not possible further to define the class attempted to be stated.

### 55.

On December 27, 1968, Christian Hospital of St. Louis (a private non-profit hospital in St. Louis, Missouri) and two other private hospitals in St. Louis commenced an action in the Eastern District of Missouri (68 C 546; after transfer here, 69 Civ. 758). The complaint showed Foster, Vogel & Stroh as attorneys for plaintiffs; the manual signature was that of John H. Stroh. The claim was stated for a class of "all private hospitals" in Missouri.

### 56.

On December 27, 1968, South Carolina commenced an action in the District of South Carolina (68–1078; after transfer here, 69 Civ. 777). The complaint showed as attorneys for plaintiffs the Attorney General of South Carolina and one of his Assistants; the manual signature was that of the Assistant, M. J. Bowen, Jr. The claim was stated for a class of all CCS entities in South Carolina.

### 56a.

On December 27, 1968, Massachusetts Blue Cross, Inc., Lynn Hospital, and fifteen other private hospitals commenced an action in the District of Massachusetts (68–1193–C; after transfer here, 69 Civ. 832). The names of Herbert P. Wilkins, Daniel O. Mahoney, and David F. Cavers, Jr. were typed at the end of the complaint as attorneys for plaintiffs; the manual signature was by Mr. Cavers. It was stated that Palmer & Dodge and Charles J. Dunn were of counsel to plaintiffs. The hospital plaintiffs asserted a claim for a class of all privately owned hospitals in Massachusetts, whether nonprofit or proprietary.

### 57.

On December 30, 1968, St. Luke's Hospital (a private non-profit hospital in Duluth, Minnesota) and four other private hospitals in Minnesota commenced an action in the District of Minnesota (68 Civ. 408; after transfer here, 69 Civ. 1555). The complaint showed Chestnut, Jones, Brooks, Kennedy & Burkard and also Cochrane & Bresnahan as attorneys for plaintiffs; the manual signatures were by Jack L. Chestnut and John A. Cochrane. The claim was stated

for a class of all private hospitals in Minnesota (non-profit or proprietary).

#### 58.

On December 30, 1968, Clark County Hospital Association, Inc. (operating a "general hospital", apparently private, in Winchester, Kentucky) and Kentucky Hospital Association, Inc. (an association of Kentucky hospitals) commenced an action in the Eastern District of Kentucky (No. 1946; after transfer here, 69 Civ. 768). The complaint showed O'Shaughnessy & Endicott as attorneys for plaintiffs; the manual signature was by R. Coleman Endicott. The action is said in the complaint to be a class action. The class is not defined but plaintiffs state that they sue as "representative of all hospitals similarly situated in Kentucky".

#### 59.

On December 30, 1968, Missouri commenced an action in this Court (68 Civ. 5180). The complaint was signed (manually) by the Attorney General of Missouri, by a Special Counsel in Missouri, and by Shapiro; the Shapiro firm was stated to be of counsel. The claim was stated to be as parens patriae for all "individual consumers" in Missouri and for a class of all CCS entities in Missouri and "all individual consumers" within that State.

#### 60.

On December 31, 1968, Bethesda Hospital Association (a private hospital in Zanesville, Ohio) commenced an action in the Southern District of Ohio (68–406; after transfer here, 69 Civ. 782). The complaint showed Graham and Graham as attorneys for plaintiff; the manual signature was by James F. Graham. The claim was stated for a class of private non-profit hospitals in Ohio.

#### 61.

On January 7, 1969, Herbert Beins doing business as Waverly Drugs (a retail drug store in Waverly, Ohio) and another commenced an action in the Southern District of Ohio (6973; after transfer here, 69 Civ. 902). The complaint showed Peck, Shaffer & Williams as attorneys for plaintiffs; the manual signature was by William B. Shaffer, Jr. The claim was stated for a class of all "retail drug store owners" in Ohio.

#### 62.

On January 14, 1969, Beekman-Downtown Hospital (a private hospital in New York City) and thirty-five other private hospitals in New York commenced an action in this Court (69 Civ. 135). The complaint showed Shea Gallop Climenko & Gould as attorneys for plaintiffs; the manual signature was by Jesse Climenko. The action was not for any class.

#### 63.

On January 15, 1969, Georgia commenced an action in this Court (69 Civ. 153). The complaint was signed (manually) by the Attorney General of Georgia, by one of his Assistants, by a lawyer in private practice in Georgia, and by Shapiro; the Shapiro firm was stated to be of counsel. The claim was stated to be as parens patriae for all "individual consumers" in Georgia and for a class of all CCS entities in Georgia and "all individual consumers" within that State.

#### 64.

On January 21, 1969, Idaho commenced an action in the Northern District of Illinois (69 C 121; after transfer here, 69 Civ. 897). The complaint showed the Attorney General of Idaho, and Specks, Collen, and Goldberg as attorneys for plaintiff; the manual signature was by Goldberg. The claim was stated for a class of all CCS entities ("governmental purchasers") in Idaho. Why Idaho should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

**65.**

On January 29, 1969, Michigan commenced an action in the Northern District of Illinois (69 C 179; after transfer here, 69 Civ. 898). The complaint is signed (manually) by the Attorney General of Michigan, by one of his Assistants, and by Freeman (as Special Counsel). The claim was stated as parens patriae for "all individual consumers" and for a class of all city, county, and public hospitals in Michigan and for another class of "all individual consumers" in that State. Why Michigan should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

**66.**

On February 3, 1969, Nashville (Tennessee) and Davidson County (in which Nashville is located) commenced an action in the Northern District of Illinois (69 C 210; after transfer here, 69 Civ. 899). The complaint was signed (manually) by the Director of Law, by the Deputy Metropolitan Attorney, and by Freeman (as Special Counsel). The claim was stated for a class of all city, county, and public hospitals in Tennessee and for a further class of "all individual consumers" in that State. Why Nashville and Davidson County should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

**67.**

On February 3, 1969, Wyoming commenced an action in the Northern District of Illinois (69 C 215; after transfer here, 69 Civ. 900). The complaint showed the Attorney General of Wyoming, Specks, Collen, and Goldberg as attorneys for plaintiff; the manual signature was by Goldberg. The claim was stated for a class of all CCS entities ("governmental purchasers") in Wyoming. Why Wyoming should have sued in the Northern District of Illinois is puzzling for the same reasons as indicated in (11) above.

**68.**

On February 5, 1969, the City of Chicago commenced an action in the Northern District of Illinois (69 C 232; after transfer here, 69 Civ. 901). The complaint was signed by the Corporation Counsel, by one of his Assistants, and by Freeman (as Special Assistant Corporation Counsel). The claim is stated for the City as a purchaser and also for "all individual consumers" in Chicago.

**69.**

On February 6, 1969, Peterson's Pharmacy, Inc. (apparently a retail drug store in Minnesota) and nine other retail druggists in Minnesota commenced an action in the District of Minnesota (69 Civ. 44; after transfer here, 69 Civ. 1554). The complaint showed Mastor, Mattson, Hart & Seran and Chestnut, Jones, Brooks, Kennedy & Burkard and Cochrane & Bresnahan as attorneys for plaintiffs; the manual signatures were by Robert W. Mattson, Jack L. Chestnut and John A. Cochrane. The claim was stated for a class of all retail druggists in Minnesota.

**II. Summary of the Actions Commenced Through February 6, 1969**

The class actions commenced through February 6, 1969 and with which we are concerned may be divided into three groups: (A) by CCS entities, for public hospitals and in a number of actions for individual consumers; (B) by retail and wholesale druggists for a class of retail and wholesale druggists; and (C) by private hospitals for a class of private hospitals, both non-profit and proprietary.

**A. Actions by CCS Entities**

By February 6, 1969, 44 actions had been commenced by CCS entities (one of which was by way of counterclaim).

Shapiro represented the largest number of these, twenty: Alabama, Florida, Georgia, Iowa, Kentucky, Louisiana, Massachusetts, Minnesota, Mississippi,

Missouri, North Dakota, Ohio, Oklahoma, Rhode Island, South Dakota, Texas, Virginia and Wisconsin; Cities of New York (counterclaim plaintiff) and Memphis.

Freeman represented plaintiffs in nine of the CCS actions: Colorado, Illinois, Indiana, Michigan, New Hampshire, Pennsylvania, West Virginia; City of Chicago; Metropolitan Government of Nashville and Davidson County.

Goldberg represented plaintiffs in eight of the CCS actions: Connecticut, Idaho, Maryland, New Jersey, New Mexico, and Wyoming; City and County of Denver; Mayor and City Council of Baltimore.

Kohn represented the plaintiffs in one of the CCS actions, that commenced by the City of Philadelphia and City of Detroit (see (11) above). The State of Delaware, the County of Erie (New York), and the Cities of Cleveland and Akron, Ohio, had moved to intervene in this action.

In three of the CCS actions—those by Arkansas, New York, and South Carolina—the plaintiffs were represented by their respective Attorneys General.

In the remaining three of the CCS actions—those by Boston, Maricopa County and Puerto Rico—the plaintiffs were represented by private counsel.

### B. Actions by Wholesale and Retail Druggists

By February 6, 1969, eleven actions had been commenced by retail drug stores and by wholesale druggists (one of which was by way of counterclaim).

The Ben Schwartz firm represented the plaintiff in one action and the counterclaiming defendant in another action.

Two of the actions, those begun in or removed to the Southern District of Florida, were duplicative.

In the other actions, separate privately retained attorneys represented the plaintiffs in each action.

Freeman represented the plaintiff in one such action (see (33) above), but

withdrew by permission in an order filed April 11, 1969.

Leo Schwartz represented the plaintiff in one such action; he also represented the City of Boston, a plaintiff in one of the CCS actions (see (15) above).

Except as indicated, no lawyer for a plaintiff in the actions by druggists was acting for a plaintiff in a CCS action. Kohn—who represented plaintiffs in one CCS action—later appeared for plaintiffs in a class action for retail drug stores commenced on March 26, 1969 (see (83) within).

### C. Actions by Private Hospitals

By February 6, 1969, fifteen actions had been commenced by private hospitals. One of these (see (60) above) did not state any claim for a class.

Two of the actions, those begun in or removed to the Southern District of Florida, were duplicative. They also combined in one action claims for a class of drug stores and for a class of private hospitals; these claims were later severed from each other.

Kohn represented plaintiffs in one of the private hospital actions (see (19) above).

### III. Negotiation of the February 6, 1969 Settlement Offers of Defendants

The defendants made and announced their settlement offers on February 6, 1969. There were two separate offers:

(1) an offer of $100,000,000 in settlement of all claims of CCS entities, wholesalers, retailers, and individual consumers; and

(2) an offer of $20,000,000 in settlement of all claims of private hospitals, of all claims of entities who reimbursed private hospitals, and of all other claims (except those covered by the $100,000,000 offer).

It seems reasonably clear that the $100,000,000 offer was principally negotiated by Shapiro (and Galligan is understood to be included in a reference to

Shapiro), with considerable assistance from Freeman, and with some assistance from Goldberg and Kohn.

The impression made by Kohn's petition is that he alone negotiated the settlement offers, that he was forced by defendants to keep the negotiations confidential from other counsel for plaintiffs, that Kohn proposed the technique of settlement, and that in September 1968 "counsel for defendants informed [Kohn] they had decided his proposals were feasible and had been favorably considered by them" (petition, p. 7). This impression is not believed to be in accord with the facts. While Kohn may have greatly helped to induce defendants to make the settlement offers, others also helped to achieve this result and the contributions of others, notably Shapiro and Freeman, are believed to have been greater than that of Kohn.

Kohn appears to have begun settlement discussions with Stewart (of counsel to Pfizer) on February 28, 1968 and to have continued these during the months through September 1968. Kohn appears to have concentrated on Pfizer.

Shapiro began to discuss settlement with McDonald (of counsel to Cyanamid) on April 12, 1968 and to have continued such talks through September 1968. Shapiro appears to have concentrated on Cyanamid.

A major obstacle to settlement was raised by Cyanamid counsel with Shapiro. This was the effect on the "passing-on" defense of the decision in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, handed down on June 17, 1968. This caused Cyanamid to fear claims of wholesale and retail druggists and to insist not only that these be specifically included in any settlement but that their impact be diminished.

It was Shapiro who overcame this obstacle. In September 1968, he developed theories of law supporting claims of the CCS entities as parens patriae for individual consumers in their areas and by such CCS entities as class representatives for a class of individual consumers. A memorandum on these theories was sent by Shapiro to Cyanamid counsel under date of October 8, 1968. These theories have also already been noted in the action commenced by Kentucky [1] on November 12, 1968 (see (41) above); they appeared in other actions commenced thereafter and they appeared by amendment in actions earlier commenced. See in this connection Hawaii v. Standard Oil Co. of Calif., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

Kohn appears to have proposed one settlement offer by defendants of all the claims, of whatever character—CCS entities, wholesalers, retailers, consumers, private hospitals and every other kind of claimant; according to Shapiro, this was "the concept of a global settlement" (Dec. 1, 1971 affidavit, p. 44). Shapiro, Freeman and others opposed this; they insisted that there should be a separate settlement with CCS entities. What evolved was something different from the Kohn "global settlement" and not quite what Shapiro and Freeman were urging. The $100,000,000 offer was for all CCS, wholesaler, retailer and consumer claims; the $20,000,000 offer was for all private hospital and all other claims.

Information about the settlement negotiations from the side of the defendants comes from an affidavit, sworn to March 19, 1970, of Roy W. McDonald, Esq., of counsel to Cyanamid. Mr. McDonald says that the settlement meetings in which he and his firm participated were "predominantly" with Shapiro and Galligan, that Freeman was present "on numerous occasions", that Goldberg and Kohn were present "at some of these meetings", and that Goldberg and Kohn were each present "at one or more conferences with defense counsel" at which Shapiro, Galligan and Freeman were not present. Mr. McDonald further tells us that between October 15, 1968 and February 1, 1969 there

---

1. Shapiro was counsel in this action.

were 15 meetings about settlement with Shapiro and Galligan, that Freeman was present at 10 of these, that Kohn was present at 3, and that Goldberg was present at 2; McDonald also says that there were "three additional meetings" with Kohn (presumably it was at these meetings that the agreement between defendants and Kohn was worked out).

According to Kohn, "counsel for defendants" in September 1968 agreed that Kohn could inform Shapiro of the "progress of the negotiations" and invite Shapiro to join in "the settlement" for his (Shapiro's) clients. If this is a suggestion that there was a "settlement" in September 1968 and that Kohn had caused it, the suggestion must be rejected in both aspects. It may be that in or shortly after September 1968, there was a merger of the Kohn-Pfizer and Shapiro-Cyanamid negotiations. Beginning October 15, 1968, the negotiations for settlement were both broader and more intense; these ended in the February 6, 1969 offers.

It does appear to be true that the $20,000,000 offer to private hospital and all other claimants was worked out between defendants on the one side and Kohn alone on the other. Of those then engaged in settlement negotiations with defendants, only Kohn represented private hospital plaintiffs in a pending action. Shapiro, Freeman and Goldberg represented no private hospital plaintiffs.

Defendants apparently made no attempt to discuss settlement with any lawyer for any private hospital plaintiff except Kohn, who represented the plaintiffs in one action. There were then pending ten other actions in which the counsel for plaintiffs were lawyers other than Kohn. These plaintiffs indeed purported to represent classes more narrowly defined than that set out in the complaint in the action in which Kohn was counsel. The Kohn actions defined the class as all private non-profit hospitals in the United States (proprietary hospitals were not included). The other actions defined their classes to include private hospitals within a single state.

That Kohn single-handedly negotiated the $20,000,000 settlement offer with defendants does not, however, suggest a generous treatment of his present petition. In the first place, as will later be seen, the $20,000,000 offer was rejected by counsel for all other plaintiffs, by American Hospital Association and by leading members of the class who were not then plaintiffs. In the second place, counsel other than Kohn later succeeded in negotiating a far better settlement offer from defendants than Kohn had done. And finally the efforts of Kohn were clouded by his simultaneous negotiation with defendants for a fee agreement for himself.

IV. The Agreement Between
The Defendants and Kohn

A. The Agreement Itself

While defendants were conducting the negotiations which resulted in the two February 6, 1969 settlement offers, they were at the same time negotiating a separate agreement with Kohn, attorney for class representatives in class actions, for payment by defendants of fees to Kohn.

On the afternoon of Monday, February 3, 1969, I had a meeting with counsel for defendants and counsel for a number of plaintiffs—certainly all the more active counsel for plaintiffs were there. It is probable that counsel for private hospital plaintiffs, other than Kohn and Ben Schwartz, were not present. The meeting was not public; the doors of the courtroom were locked; there was no reporter; and the press was not invited. The reason for the secrecy, as told to me and as I now remember it, was simply that the defendants were about decided to make their settlement offers but until they were firmly decided and had agreed on the text of the offers, they did not want any publicity because it might be premature. Under these explanations, I permitted the meeting to take place with

the conditions described. The offers expected to be made were then generally explained and I was also told of the agreement by defendants to pay Kohn the "fair and reasonable" value of his services.

The fee agreement with Kohn is contained in a letter to him dated February 6, 1969, signed by counsel for defendants. The letter recites that Kohn, beginning in February 1968, had "made suggestions for plans of settlement" and that the two offers made on February 6, 1969 were "incorporating several" of the "suggestions" of Kohn. The letter then refers to the February 6, 1969 settlement offers and states that if "a settlement is ultimately achieved substantially in accordance therewith", the defendants will pay Kohn "the fair and reasonable value" of his services. The letter continues that if the "sum" for the "fair and reasonable" value of Kohn's services could not be "mutually agreed upon", then it was to be "determined by the Court".

A copy of the February 6, 1969 letter to Kohn was sent to me on the same date by counsel to one of the defendants. The present petition is based on the February 6, 1969 letter agreement.

It may be noted that, as will hereafter be seen, settlement was not "achieved" in accordance with the February 6, 1969 settlement offers because the $20,000,000 offer, due to the efforts of counsel for plaintiffs other than Kohn, had to be raised and changed. On this petition, the defendants make no point that the settlement as raised and changed was not "substantially" in accordance with the February 6, 1969 settlement offers.

### B. Why The Agreement Was Made

When considering the fee agreement with Kohn, speculation as to its motivation is inevitable. There were four lawyers for plaintiffs who were negotiating with defendants for a settlement before February 6, 1969: Shapiro, Freeman, Goldberg, and Kohn. Why should defendants agree to pay fees only to Kohn? There was no similar agreement made with any lawyer for any other plaintiff.

The explanation for defendants as given at the January 24, 1972 hearing was that Kohn "intended to make a claim that his services in the negotiations had benefited the entire group" (SM 38), that is, it was believed that Kohn would ask for a fee allowance in all of the class actions (whether he was counsel in the action or not), probably urging the theory of Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184 (1939). The defendants say that they were fearful that the assertion of such a claim by Kohn would "make it difficult" for defendants "to attract to the settlement" (SM 38) the plaintiffs in the pending actions. By promising themselves to pay Kohn the fair and reasonable value of his services, they prevented the assertion by him of any such counsel fee claim. This explanation is accepted as showing a major motivating factor. Counsel other than Kohn (that is, Shapiro, Freeman and Goldberg) had substantial clients and were counsel in actions where the class funds, from which their allowances would come, would be substantial; counsel fee claims from them in other actions than those in which they appeared must have seemed unlikely. Kohn, on the other hand, represented less significant plaintiffs in only one CCS action and at that time (on and before February 6, 1969) represented plaintiffs in only one private hospital action; Kohn would therefore have a much stronger incentive than the other three negotiating lawyers to make counsel fee claims in actions other than those in which he appeared.

But there must have been, perhaps unconsciously, a further motive on behalf of defendants for the Kohn agreement. The defendants were trying to settle the private hospital claims; Kohn represented plaintiffs in a private hospital action stating claims for a national class of private non-profit hospitals and was the only lawyer for hospital plaintiffs with whom defendants were negotiating. If Kohn as counsel for the potential private hospital

class agreed with defendants on the $20,-000,000 figure, a settlement on that basis might be achieved. Undoubtedly, agreement by Kohn on such a settlement figure could more easily be secured if Kohn had a guarantee that defendants would be answerable for his fees. At the same time, Kohn must have felt that a judge would be more generous in fixing the amount of fees to him if such amount were payable by defendants and did not in any way diminish the recovery of class members. Thus, the fee agreement was designed to secure the cooperation of Kohn.

### C. Propriety of the Agreement Between Defendants and Kohn

The fee agreement between Kohn and defendants raises somewhat disturbing questions, as I have already indicated at one or more hearings.

Kohn was acting on behalf of a class. There had not yet been a determination that the actions in which he appeared as counsel could be maintained as class actions. (Fed.R.Civ.P. 23(c) (1)). But he still was negotiating for class members. At the same time, he was negotiating an agreement by which defendants would pay his fees. This seems to involve some conflict of interest. True, the *amount* of the fee to Kohn was not fixed nor even discussed with defendants. The parties apparently felt that this circumstance eliminated any question of conflict of interest. But it does not appear entirely to do so. A plaintiff's lawyer who has an agreement that defendants will pay his fees has a strong motive so to conduct himself that defendants will not question or oppose the amount for which he ultimately applies as a fee. I have referred to this question in an unreported opinion filed January 24, 1969 in Josephson v. Campbell (68 Civ. 1356, 68 Civ. 1455). See also Saylor v. Lindsley, 456 F.2d 896 (2d Cir. 1972).

In the case at bar, there is nothing to indicate that the parties were conscious of any conflict of interest or self-interest which would affect the result. But the procedure seems wrong in principle and ought to be discouraged. Moreover, however high-minded the parties may be, the appearances are frequently unfortunate. The scholarly Corporation Counsel of the City of New York in a letter to the Court condemns such an agreement as that with Kohn on the ground that it is wrong in principle; he points out that some may feel that, except for such a fee agreement, the class recovery would be larger.

In the case at bar, as will be seen, all counsel for private hospital plaintiffs except Kohn rejected the $20,000,000 offer. Kohn alone supported acceptance of the $20,000,000 offer. While doubtless this represented his sincere conviction, those so disposed could easily suspect that the fee agreement affected his judgment.

Under all the circumstances, however, there seems no reason to nullify the Kohn fee agreement. There was no secrecy. The agreement was disclosed to the Court and to other counsel. Payment by defendants will not diminish any recovery by any class member. To relieve defendants of their obligation to pay Kohn would simply give to defendants an undeserved windfall. The agreement will be enforced.

### V. Commencement of Private Hospital Actions after February 6, 1969

There were a number of civil actions commenced by private hospital plaintiffs after the February 6, 1969 settlement offers had been announced.[2]

#### 70.

On February 7, 1969, Burlington Hospital (a private non-profit hospital in Burlington, Iowa) and fifteen other private non-profit hospitals in Iowa commenced an action in the Southern District of Iowa (8–2328–C–1; after transfer here, 69 Civ. 1136). The complaint

---

2. Some other actions were commenced in this period by CCS entities and by wholesale or retail druggists but, except for those in which Kohn appeared, these will not be described in this opinion.

was signed (manually) by Richard W. Berglund and Verne Lawyer as attorneys for plaintiffs. The claim was stated for a class of all private hospitals in Iowa "similarly situated" (by which is understood to mean non-profit private hospitals).

### 71.

On February 26, 1969, American Hospital Association, Inc. (AHA) and ten private non-profit hospitals commenced an action in this Court (69 Civ. 755). The complaint was signed by Arnold & Porter, a law firm in Washington, and by a New York law firm; the manual signatures were those of Abe Krash and Geoffrey M. Kalmus. The claim was stated for a class of all private hospitals in the United States, both non-profit and proprietary. AHA is a non-profit organization, the membership of which consists of some 3,300 private hospitals.

### 72.

On March 12, 1969, Blue Cross of Northeast Ohio and 40 hospitals in Ohio (whether private or public is not stated) commenced an action in this Court (69 Civ. 1015). The complaint showed the name of Breed, Abbott & Morgan as attorneys for plaintiffs; the manual signature was that of Bagdasarian. The claim was stated for a class of "all hospitals" in certain named counties in Ohio. (An amended complaint was filed, by leave, on August 27, 1970; the amendment eliminated all statements of a class action.)

### 73.

On March 20, 1969, Connecticut Blue Cross, Incorporated, commenced an action in this Court (69 Civ. 1142). The complaint showed the name of Breed, Abbott & Morgan as attorneys for plaintiff; the manual signature was that of Bagdasarian. The claim was stated for a class of "all hospitals" in Connecticut. (An amended complaint was filed, by leave, on March 30, 1970; the amend-ment eliminated all statements of a class action.)

### 74.

On April 24, 1969, The Kansas Hospital Association and 12 private hospitals in Kansas commenced an action in the District of Kansas (T–4560; after transfer here, 69 Civ. 2522). The complaint showed the names of Boyer, Donaldson & Stewart, of Goodell, Casey, Briman, Rice & Cogswell and of Jochems, Sargent & Blaes as attorneys for plaintiffs; the manual signatures were by James R. Hanson, Wayne T. Stratton, and Stephen M. Blaes. The claim was stated for a class of all private hospitals in Kansas, both profit and proprietary.

### 75.

On May 19, 1969, Blue Cross of Western Pennsylvania and 15 private hospitals in Pennsylvania commenced an action in this Court (69 Civ. 2158). The complaint showed the name of Breed, Abbott & Morgan as attorneys for plaintiffs; the manual signature was that of Bagdasarian. The claim was stated for a class of all private hospitals in certain named counties of Pennsylvania.

### 76.

On September 10, 1969, Northwest Hospital, Inc., apparently a proprietary hospital in Illinois, commenced an action in the Northern District of Illinois (69 C 1859; after transfer here, 69 Civ. 4446). The complaint showed Lewis W. Schlifkin, Edward A. Berman, and Lawrence Walner as attorneys for plaintiff; they also signed manually. The claim was stated for a class of "all hospitals in the United States".

### 77.

On September 18, 1969, Washington State Hospital Association and two private hospitals in the State of Washington, one non-profit and the other proprietary, commenced an action in the Western District of Washington (8539;

after transfer here, 69 Civ. 5105). The complaint showed William L. Dwyer, Louis F. Mawrot, Jr., and Culp, Dwyer, Guterson & Grader as attorneys for plaintiffs; the manual signature was that of Dwyer. The claim was stated for a class of all private hospitals in the State of Washington, non-profit and proprietary.

### 78.

On September 25, 1969, Haverford Hospital Corporation, apparently a private proprietary hospital in Pennsylvania, and 11 other private proprietary hospitals in Texas, Alabama, and Pennsylvania commenced an action in the Eastern District of Pennsylvania (69–2249; after transfer here, 69 Civ. 4629). The complaint showed the typed names of Kohn, Fine, Korman, Berger, Newberg, Montague, and Schambelan; the manual signature was by Korman. The claim was stated for a class of "all proprietary hospitals, clinics and nursing homes in the United States".

### 79.

On May 13, 1970, The French Hospital of Los Angeles and 30 other private hospitals in California commenced an action in the Central District of California (70–1101–IH; after transfer here, 70 Civ. 2789). The complaint showed Marks & Heaman as attorneys for plaintiffs; the manual signature was by Donald B. Marks; the name of Paul D. Scanlon was shown as of counsel. The claim was stated for a class of "all private hospitals" in California.

### VI. Negotiation of the April 3, 1970 Settlement Offer by Defendants to Private Hospitals

The February 6, 1969 settlement offer of $20,000,000 was supported only by Kohn and by defendants.

Counsel for plaintiffs in the other private hospital actions rejected the $20,000,000 settlement offer. Notably, it was rejected by AHA, the private hospital organization which by bulletin urged its members not to accept the February 6, 1969 offer because it was said to be inadequate.

A group was organized on June 11, 1969 to negotiate a better settlement with defendants. The Blue Cross plan plaintiffs were represented in this group; the private hospital representatives were Krash (of Arnold & Porter, attorneys for plaintiffs in the action described in (71) above) Bagdasarian (of Breed, Abbott & Morgan, attorneys for plaintiffs in the actions described in (35), (44), (72), (73) and (75) above), and Ben Schwartz (of Schwartz & Alschuler, attorneys for plaintiffs in the action described in (7) above); Schwartz appears to have been chairman of this negotiating group.

Kohn and the defendants urged in June and September, 1969, that the $20,000,000 settlement offer be submitted to the class members for acceptance or rejection. All other counsel for plaintiffs opposed and the $20,000,000 settlement offer was never submitted to the class members.

There were renewed negotiations with defendants and these finally led to a second settlement offer dated April 3, 1970. This was an offer of $32,500,000 and is the offer later approved, and now under administration.

At the time the second offer was made on April 3, 1970 defendants by letter advised all counsel in private hospital actions of the agreement between defendants and Kohn for payment of his fees.

The differences in the second offer have been explained in my opinion approving that settlement (52 F.R.D. at 135):

"The principal features of the second offer of settlement were: (a) the amount to be paid by defendants was raised to $32,500,000 from $20,000,000, (b) the claims to be settled were somewhat narrowed to include only claims of private hospitals and Blue Cross plans, (c) the settlement amount was to be paid into escrow on a fixed date, creating the probability of a substantial interest accrual for the benefit of the claimants, and (d) a division

of the settlement amount is specified as between the private hospitals and the Blue Cross plans."

So far as appears from the record, Kohn had nothing to do with negotiating the second and better settlement offer.

## VII. Procedural Steps After the April 3, 1970 Settlement Offer, in Private Hospital actions

The April 3, 1970 settlement offer was accepted by all Blue Cross plan plaintiffs and by all except one of the private hospital plaintiffs.

By order filed November 24, 1970, all private hospital and Blue Cross actions in which plaintiffs accepted the April 3, 1970 settlement offer were consolidated for administration of that settlement. There were 27 such actions. It was provided that the caption to be used for all papers would be based on that in the action brought by AHA (see (71) above), except that since AHA was not to be a class representative the first plaintiff in the caption should be "Hartford Hospital."

By another order filed November 24, 1970, it was determined that nineteen class actions in consolidation should be maintained as class actions (Fed.R.Civ. P. 23(c)(1)), the class was defined and two separate notices were directed to be sent to class members. One was a notice of class action (Fed.R.Civ.P. 23(c)(2)) and the other a notice of a hearing on the proposed settlement (Fed.R.Civ.P. 23 (e)).

The two notices were mailed on or about December 18, 1970.

The hearing on the proposed settlement was duly held on February 19, 1971.

On April 9, 1971, an order was filed approving an escrow agreement under which defendants deposited the settlement sum in escrow.

By opinion filed April 21, 1971, the proposed settlement was approved. 52 F.R.D. 131. An order and judgment was filed on May 24, 1971.

On September 20, 1971, an order was filed which, among other things, ap-pointed a Special Master and directed that all applications for allowances of counsel fees and expenses be filed not later than December 15, 1971.

On January 24, 1972, the present petition of Kohn was submitted and heard.

On February 7, 1972, the Special Master filed an interim report with respect to distribution of the settlement sum to private hospitals.

On or about March 3, 1972, notice was mailed to class members of a hearing on distribution and on allowances for counsel fees and expenses.

The hearing was held on March 24, 1972.

## VIII. Services Performed by Kohn

Kohn represented plaintiffs in three class actions already described (see (11), (19), and (78) above. In addition he acted for plaintiffs in other actions which do not participate in the settlements being administered by me but which should be mentioned, at least briefly.

### 80.

Hillman Medical Center and others v. Pfizer and others, 68 Civ. 4321 (S.D. N.Y.); 68–162 (E.D.Pa.)

This action was commenced on January 22, 1968 in the Eastern District of Pennsylvania; it was for a class of health centers, etc. It was not included within the settlements administered by me, was transferred by the Panel to Judge Lord (320 F.Supp. at 592), and has been settled and dismissed.

### 81.

Kent Pharmaceuticals Co. v. Pfizer and others, 68 Civ. 4320 (S.D.N.Y.); 68–384 (E.D.Pa.)

This action was commenced on February 19, 1968 in the Eastern District of Pennsylvania; it was not a class action. It is not involved in the settlements administered by me, was transferred by the Panel to Judge Lord (320 F.Supp. at 592), and has been settled and dismissed.

## 82.

Hawaii Medical Service Association v. Pfizer and others; 69 Civ. 838 (S.D.N.Y.); 68–2799 (E.D.Pa.)

This action was commenced on December 27, 1968 in the Eastern District of Pennsylvania and was for a class of insurance companies. It was not included within the settlements administered by me, was transferred by the Panel to Judge Lord (320 F.Supp. at 592), and has been settled and dismissed.

## 83.

Sunray Drug Co. and others v. Pfizer and others, 69 Civ. 2005 (S.D.N.Y.); 69–687 (E.D.Pa.)

This action was commenced on March 26, 1969 in the Eastern District of Pennsylvania and was stated to be a class action for all retail drug stores and other sellers of drugs in the United States. Apparently because the plaintiffs in this action had not accepted the offer of settlement by the time of the order filed May 26, 1969, this action was not determined to be maintainable as a class action. The plaintiffs will, however, participate as class members represented by plaintiffs in the class actions consolidated; this action was dismissed by order of this Court filed September 29, 1970.

What Kohn did in the negotiations which resulted in the February 6, 1969 settlement offers has already been described.

The three actions in which Kohn acted as counsel and which participate in the settlements administered by me ought now to be separately considered in respect of the services of Kohn in each action.

### A. City of Philadelphia and City of Detroit action

This action has been described in (11) above. It was commenced on January 18, 1968.

It is stated by Kohn that he had a fee agreement for 25% of the recovery with the plaintiffs and intervenor plaintiffs in this action, except that in respect of the City of Akron, the County of Summit (Ohio), and the City of ·Madison Heights (Michigan) it is stated that the fee agreement was for 33⅓% of the recovery but that this had been "voluntarily reduced" by Kohn to 25%. The fee agreement statement is contained in an undated petition filed by Kohn and associates in this action on December 28, 1971.

## 84.

On February 13, 1968, a motion of Erie County, New York, for leave to intervene in this action as a party plaintiff was filed by Kohn in the Eastern District of Pennsylvania. No reason for intervention was given; it was stated that Erie County was a member of the class represented in the action and had made purchases of the products in suit. Erie is a populous county in Western New York and includes the City of Buffalo.

The motion to intervene was not acted upon by the time the action was transferred to this District by the Panel on October 21, 1968, (295 F.Supp. 1402) nor was any action thereafter taken by Kohn in respect of the motion until submission of a stipulation to Judge Murphy in May 1969.

It is difficult to see any good reason for intervention by Erie County, under a 25% fee agreement, in an action in the Eastern District of Pennsylvania. It was a member of the class stated in the complaint, whether it intervened or not. Moreover, the State of New York had an action pending in this Court on and after February 29, 1968 (see (20) above) and after February 7, 1969 that action stated a claim for a class which included Erie County.

## 85.

After the action had been transferred here on October 21, 1968, and under date of December 24, 1968, Berger and Montague—two lawyers associated with Kohn—sent to the Clerk of this Court a motion of the State of Delaware for leave

to intervene as a plaintiff in the action. No reason for intervention was given; it was stated that Delaware was a member of the class represented in the action and had made purchases of the products in suit.

No action was thereafter taken by Kohn or by any of his associates in respect of the motion to intervene of Delaware until submission of a stipulation to Judge Murphy in May 1969.

The motion papers for Delaware appear to have been physically placed by the Clerk in the file but never to have been stamped or docketed to indicate receipt by the Clerk. Attached to the State of Delaware papers is a note by the Clerk to me, dated "12/27/68", questioning whether there has been a compliance with Fed.R.Civ.P. 24(c). As noted in a memorandum and order filed by me on February 10, 1972 in this action, "I have no recollection of ever having seen these papers and indeed was out of the country from December 18, 1968 to January 8, 1969" (Order of February 10, 1972, at 1).

It is difficult to see why the State of Delaware elected to seek intervention in an action commenced by the Cities of Philadelphia and Detroit in the Eastern District of Pennsylvania, which action, at the time intervention was first sought, was pending in this District. It might be supposed that Delaware would more logically commence an action on its own behalf and as a representative of state classes and that such action would be commenced either in Delaware or in this Court.

### 86.

At the same time as they sent to the Clerk the Delaware motion, Berger and Montague also sent to the Clerk of this Court a motion of the Cities of Cleveland and Akron for leave to intervene in this action as parties plaintiff. No reason for intervention was given; it was stated that Cleveland and Akron were members of the class represented in the action and had made purchases of the products in suit.

No action was thereafter taken by Kohn or by any of his associates in respect of the motion to intervene of Cleveland and Akron until submission of a stipulation to Judge Murphy in May 1969.

The motion papers for Cleveland and Akron appear to have been physically placed by the Clerk in the file but never to have been stamped or docketed to indicate receipt by the Clerk. Attached to the motion papers for Delaware (to which the Cleveland and Akron motions were attached) was the note by the Clerk to me, dated "12/27/68", questioning whether there has been a compliance with Fed.R.Civ.P. 24(c). I have no recollection of ever having seen these papers and indeed was out of the country from December 18, 1968 to January 8, 1969.

When Cleveland and Akron moved to intervene, the State of Ohio had pending in this Court an action commenced many months before (see (28) above) for a class which included Cleveland and Akron. Why under these circumstances the two Ohio cities should seek intervention, under a 33⅓% or 25% fee agreement, in an action commenced in the Eastern District of Pennsylvania and then pending in this Court, is puzzling in the extreme.

### 87.

Under date of February 6, 1969, Berger —associated with Kohn—sent to the Clerk of this Court a motion of the County of Allegheny (Pennsylvania) and of the City of Pittsburgh for leave to intervene as parties plaintiff in the action. It was stated that "no hearing date is presently requested" because the parties were "preparing to enter into a stipulation . . . permitting these interventions."

Allegheny is the County of Pennsylvania in which the City of Pittsburgh is located.

No reason for intervention was given; it was stated that Allegheny County and Pittsburgh were members of the class represented in the action and had made purchases of the products in suit.

No action was thereafter taken by Kohn or by any of his associates in respect of the motion to intervene of Allegheny County and Pittsburgh until submission of a stipulation to Judge Murphy in May 1969.

The Commonwealth of Pennsylvania had commenced a class action in this Court on March 26, 1968 (see (22) above) for a class of all city, county and public hospitals in Pennsylvania. Why under these circumstances Allegheny County and Pittsburgh should seek intervention, under a 25% fee agreement, in an action commenced in the Eastern District of Pennsylvania and then pending in this Court, is puzzling in the extreme.

### 88.

Under date of February 10, 1969, Berger—associated with Kohn—sent to the Clerk of this Court a motion (a) of the City of Buffalo (New York), (b) of the Town of Redford (Michigan), (c) of the City of Madison Heights (Michigan), and (d) of the City of Santa Clara (California) for leave to intervene as parties plaintiff in the action. It was stated that "no hearing date is presently requested" because the parties were "preparing to enter into a stipulation . . . permitting these interventions."

No reason for intervention was given; it was stated that the movants were members of the class represented in the action and had made purchases of the products in suit.

No action was thereafter taken by Kohn or by any of his associates in respect of the motion to intervene of these four movants until submission of a stipulation to Judge Murphy in May 1969.

### 88(a).

The City of Buffalo is in western New York. At the time such intervention was sought the State of New York had an action pending in this Court (see (20) above) for a class which included the City of Buffalo. Why Buffalo should seek to intervene, under a 25% fee agreement, in an action commenced by the City of Philadelphia is hard to understand. It would seem that the interests of Buffalo would have been better served by relying on the State of New York action or by intervening in that action.

### 88(b).

The "Town of Redford" Michigan, the name used in the motion papers, seems to be actually the "Township" of Redford, having a population of 71,901, apparently in Wayne County, Michigan (Rand McNally, Cosmopolitan World Atlas—Enlarged "Planet Earth" Edition, p. 234 (1971 ed.)). At the time the Township of Redford moved to intervene in this action, the State of Michigan had on January 29, 1969 commenced an action in the Northern District of Illinois (see (65) above) for a class which included public hospitals of the Township of Redford and all consumers resident therein. Why the Township of Redford should under these circumstances seek to intervene with a 25% fee agreement in an action commenced by the City of Philadelphia is puzzling in the extreme.

### 88(c).

Madison Heights is apparently a city in Oakland County, Michigan, in the metropolitan district of Detroit and with a population of 33,343.

For the reasons given above in respect of the Township of Redford, Michigan, it is difficult to see why Madison Heights should have sought to intervene under a 25% fee agreement in an action commenced by the City of Philadelphia.

### 88(d).

Santa Clara is a city of 58,880 people in Santa Clara County in California, not far from San Francisco.

At the time the City of Santa Clara moved to intervene in this action, the State of California had commenced an action on April 8, 1968 in the Northern District of California (No. 49044) which had been transferred by the Panel to this

District (68 Civ. 4343) by an order made on October 21, 1968 (295 F.Supp. 1402).

The action by the State of California was for a class which included the City of Santa Clara and all consumers resident therein.

Why the City of Santa Clara should under these circumstances seek to intervene with a 25% fee agreement in an action commenced across the continent by the City of Philadelphia is hard to understand.

### 89.

On February 18, 1969, a motion was filed by Kohn or Berger or some associate for leave to the City of Flint (Michigan) and the City of Dearborn (Michigan) to intervene in this action as parties plaintiff. Whether the motion papers were sent with a letter does not appear. No reason for intervention was given; it was stated that Flint and Dearborn were members of the class represented in the action and had made purchases of the products in suit.

No action was thereafter taken by Kohn or by any of his associates in respect of the motion to intervene of Flint and Dearborn until submission of a stipulation to Judge Murphy in May 1969.

Flint is a city in Genesee County Michigan, not far from Detroit; it has about 200,000 people. Dearborn is a city of something over 100,000 people in Wayne County, Michigan, in the metropolitan area of Detroit.

For the reasons given above (see 88 (b) above) in respect of the Township of Redford, it is difficult to see why Flint and Dearborn should have sought to intervene under a 25% fee agreement in an action commenced by the City of Philadelphia.

### 90.

It will be seen that to this point motions had been filed by Kohn asking leave to intervene for twelve scattered government entities.

It will also have been seen that nothing had been done to bring these motions before the Court for decision. In one or more letters, it had been explained by associates of Kohn that the parties were preparing a stipulation to permit the intervention.

Nothing was ever done, however, to secure any order of the Court permitting intervention, as required (Fed.R.Civ.P. 24(b) and (c)) and no such order was ever made.

Instead, a written stipulation dated May 9, 1969 was made between Kohn and counsel for defendants that "the Complaints of plaintiffs" (Philadelphia and Detroit) and "the Complaints and proposed Complaints of intervenor plaintiffs", listed in the stipulation, be amended to include claims parens patriae for consumers and for a class of consumers. It must be noted that this stipulation assumes—contrary to the fact—that there were intervenor plaintiffs. The effect of the stipulation is to amend complaints and proposed complaints of those mistakenly assumed already to be parties.

There is an even more remarkable example of carelessness in the stipulation. Of the 18 intervenor plaintiffs listed in the stipulation, 6 (counting the City and County of Honolulu as separate entities) had never even moved to intervene and had never even filed a proposed complaint, much less secured an order of the Court permitting intervention. These 6 entities, whose names appear for the first time in the May 9, 1969 stipulation were:

County of Summit (Ohio)
City of Lansing (Michigan)
City of Honolulu
County of Honolulu
City of Tampa (Florida)
Board of Education of the Black Horse Pike Regional School District (New Jersey)

The stipulation was then submitted to Judge Murphy, who was apparently the judge dealing with ex parte civil matters. As I noted in a memorandum and order filed February 10, 1972 in this

action, "Why the stipulation was submitted to Judge Murphy at a time when I was in the Court House, does not appear" (Order of February 10, 1972, at 2).

The stipulation was signed "so ordered" by Judge Murphy on May 15, 1969 and was filed on May 16, 1969.

There seems no more reason for intervention by the 6 new entities who did not file any motions than there was for those who did file motions.

#### 91.

The County of Summit in Ohio includes the City of Akron. The State of Ohio had pending in this Court since May 17, 1968 an action (see (28) above) for a class which included the County of Summit. Why under these circumstances the County of Summit should seek intervention, under a 33⅓% fee agreement, in an action commenced by the City of Philadelphia is hard to understand.

#### 92.

The City of Lansing is the capital of Michigan and has about 100,000 people. The State of Michigan had pending since January 29, 1969, an action (see (65) above) for a class of all city, county and public hospitals in Michigan and for a class of individual consumers in that State. Why under these circumstances the City of Lansing should seek intervention, under a 25% fee agreement, in an action commenced by the City of Philadelphia is hard to understand.

#### 93.

The City and County of Honolulu are in Hawaii which had commenced an action on December 20, 1968 in the District of Hawaii. While the action by Hawaii was not, at least in the beginning, a class action, there is no reason why the City and County of Honolulu could not have asked leave to intervene in that action. Why under these circumstances the City and County of Honolulu should seek intervention, under a 25% fee agreement, in an action commenced by the City of Philadelphia is hard to understand.

#### 94.

The City of Tampa is in Florida, which had had pending since October 25, 1967 an action (see (8) above) for a class which included the City of Tampa and since February 18, 1969 for a class of individual consumers in Florida. Why under these circumstances the City of Tampa should seek intervention, under a 25% fee agreement, in an action commenced by the City of Philadelphia is hard to understand.

#### 95.

The name of "Board of Education of the Black Horse Pike Regional School District (New Jersey)" appears for the first time in the stipulation "so ordered" by Judge Murphy on May 15, 1969.

Why a school district or a Board of Education would have any interest whatever in an antibiotic antitrust claim is nowhere explained.

It does appear that there is such an entity in New Jersey as "Board of Education, Black Horse Pike Regional School District". The authority of this entity is "limited to the construction and operation of a high school". Township of Gloucester v. Board of Education, etc., 50 N.J.Super. 437, 439, 142 A.2d 689, 690 (Superior Ct., Law Div. 1958). It further appears from the cited decision that the Black Horse Pike School District is in Camden County, New Jersey, and includes three municipal corporations— the Township of Gloucester, the Borough of Runnemede, and the Borough of Bellmawr. These have a total population of 40,800 (Rand McNally, Cosmopolitan World Atlas, Enlarged "Planet Earth" Edition, pp. 238–39 (1971 ed.)).

When Black Horse Pike etc. first appeared in a paper on May 15, 1969, the State of New Jersey had already on August 22, 1968 commenced an action on behalf of "all governmental purchasers of . . . antibiotics . . . in the State of New Jersey" (see (33) above).

This action commenced in the Northern District of Illinois (68 C 1564), had been transferred to this District (68 Civ. 4929) by the Judicial Panel on November 25, 1968.

Assuming (which seems contrary to the fact) that a New Jersey school district had any real interest in an antibiotics drug antitrust claim, why such a district having a population of about 40,000 should seek to intervene under a 25% fee agreement in an action of the City of Philadelphia is puzzling in the extreme.

From the time of the order of Judge Murphy on the stipulation, such order having been filed on May 16, 1969, it has been mistakenly assumed on all sides that the 18 scattered government entities had properly intervened.

96.

It soon appeared, however, that the City of Flint had second thoughts about its "intervention" in the City of Philadelphia action. Before July 2, 1969, it advised that it preferred to be represented in the State of Michigan action. Thereafter, in due course, an order on consent was filed on June 12, 1970 approving the withdrawal of the City of Flint as an intervenor (see 314 F.Supp. at 722).

97.

It developed that the assumed intervention of Santa Clara and Black Horse Pike caused unique complications.

The State of California and the County of Santa Clara—parties to another action —did not wish to accept the settlement; the City of Santa Clara wished to accept. By order filed June 19, 1969, I ruled that the City of Santa Clara could not accept (see 314 F.Supp. at 725–726, 747).

As to Black Horse Pike, probably because it had no hospital beds, it was not proposed to pay anything by way of settlement.

In an opinion filed June 24, 1970, a proposed compromise settling certain of the actions, including the City of Philadelphia action, was approved. 314 F. Supp. 710. The opinion stated that as to two intervenor plaintiffs in this action, the City of Santa Clara, California, and the Board of Education of the Black Horse Pike Regional School District, New Jersey, nothing would be paid in settlement to them and the action "will not on the present record be dismissed" (314 F.Supp. at 747).

98.

It was an error on my part to permit the creation by Kohn of the procedural morass set out above. The order signed by Judge Murphy was not significant in this respect; had the order been presented to me, I would very likely have signed it. The defendants bear a substantial part of the blame; they agreed (as part of their cooperation with Kohn) to interventions which accomplished nothing except to complicate and impede the administration of the settlement, to increase the expense of administration, and and to add to the burden on this Court.

For example, after the order of Judge Murphy, filed May 16, 1969, it was assumed that the plaintiffs and the "intervenors" in this action represented a class of consumers. When class action notices to consumers were given (Fed.R. Civ.P. 23(c)(2); see 314 F.Supp. 724–725), special notices had to be published in respect to the classes "represented" by the "intervenors". The response to the fragmentation accomplished by Kohn was predictable: there is 1 member of the class represented by Township of Redford and 3 members of the class represented by Summit County! Many of the other classes have a relatively small membership. The total membership of the 15 classes purported to be represented by the would-be intervenors is 1175 consumers, or an average class membership of about 78.

It would not be too late to disregard the assumed interventions and to vacate all orders relating to them, leaving the assumed intervenors to participate as members of their proper classes in the proper actions. It has been concluded, however, that such a course at this late

date would probably be more expensive and more burdensome as a matter of administration of the settlement than to permit the interventions of those scattered entities which purport to represent consumers. Accordingly, a separate order has been filed which recognizes the interventions, except as to the City of Flint, the City of Santa Clara, and the Black Horse Pike Regional School District.

### 99.

The further services performed by Kohn in this action have involved in general the sending out or publishing the class action notice, the problems of allocation of the settlement fund, the notice of hearing on approval or not of the proposed settlement, the hearing on the proposed settlement, the entry of final orders and judgments, the processing of claims filed by consumers (that is, determining whether the claim should be allowed, reduced, or disallowed), the payments to those plaintiffs and intervenors of claims made for their own account, and the preparation of a plan for a second stage allocation. Further services will be required in connection with notices of a hearing on a second stage allocation plan, the hearing itself, and distribution of the settlement amounts.

### B. The Fort Pierce Hospital Action

This action has been described in (19) above. It was commenced on February 28, 1968.

An amended complaint was filed on March 14, 1968, the effect of which was to add as a plaintiff Deborah Hospital located in Browns Mills, a small town in Burlington County, New Jersey.

It is stated by Kohn that he had a fee agreement for 25% of the recovery with 25 private hospitals, including the plaintiffs and intervenor plaintiffs in this action, except that in respect of Deborah Hospital and John F. Kennedy Hospital it is stated that the fee agreement was for 33⅓% of the recovery but that this had been "voluntarily reduced" by Kohn to 25%. The fee agreement

statement is contained in an undated petition filed by Kohn and associates on December 15, 1971.

### 100.

There were three stipulations between Kohn and defendants that various private hospitals be permitted to intervene as parties plaintiff. These stipulations were submitted to three judges of this Court for signature as an order and after being "so ordered" were filed. The dates of filing, the judge making the order, and the hospitals allowed to intervene are as follows:

July 23, 1969 (Tyler, D. J.)
>   Art Centre Hospital
>   Detroit, Michigan
>   Holy Redeemer Hospital
>   Meadowbrook, Pennsylvania

August 8, 1969 (Tenney, D. J.)
>   Eugene Leland Memorial Hospital
>   Riverdale, Maryland
>   Tidewater Memorial Hospital
>   Tappahannock, Virginia
>   Wytheville Memorial Hospital
>   Wytheville, Virginia

March 13, 1970 (Wyatt, D. J.)
>   Hospital & Home for the Jewish Aged
>   Philadelphia, Pennsylvania

No reasons for any of the interventions were given. It was in each case stated that the movant was a member of the class and had made purchases of the products in suit.

In the context here, it is hard to see any advantage to a hospital class member from intervention in a class action for hospitals. Presumably all members of such class will share in a settlement fund, whether they intervene as a plaintiff or not. Presumably, expenses as allowed by the Court (including counsel fees) will be paid from any fund to be distributed; all class members will thus bear such expenses equally. There seems little, if any, reason for a hospital class member to make a fee agreement, 25% or otherwise, unless in need of special professional services, such as proof that

it is a member of the class, or some like issue not common to all class members.

## 101.

What Kohn did in the negotiations for the February 6, 1969 settlement offers has already been described (see III above).

It appears that Kohn had little, if anything, to do with negotiating the $32,500,000 offer of April 3, 1970 to private hospitals.

Aside from services in the hospital interventions described in (100) above, Kohn has been engaged in connection with notices to class members, the hearing on approval or not of the $32,500,-000 settlement, the making of final orders and judgments, and the distribution of the settlement fund. This last involves very limited services; the private hospital actions do not involve the submission of claims by class members; it is not necessary for Kohn to examine any claims; the formula for distribution is contained in the settlement offer itself and is being worked out by a Special Master under the supervision of the Court.

### C. The Haverford Hospital Action

This action has been described in (78) above. It was commenced on September 25, 1969.

The complaint was virtually word for word the same as the Fort Pierce Hospital action.

There were no interventions.

The pendency of the Haverford Hospital action did not increase to any significant extent the professional services of Kohn. Doubtless the Haverford Hospital action was commenced so that proprietary hospitals represented by Kohn could have a class action pending.

### IX. The "Fair and Reasonable Value" of Kohn's Services

The task now presented to the Court is a heavy one. It is to determine the "fair and reasonable value" of the services of Kohn as counsel in the actions of "various plaintiffs" against defendants (February 6, 1969 letter). The actions are those seven actions listed and described in VIII above. The parties have not agreed on the "fair and reasonable value" and thus under the agreement it must be determined by the Court.

While defendants have not agreed on that value, they stated that if Kohn limited his petition to a fee of $2,000,000 defendants would not oppose his petition but that nevertheless "the fee to be paid to petitioner would have to be determined by the Court" (January 24, 1972, SM 6).

It would be the easier course to find the "fair and reasonable value" to be $2,000,000, as I indicated was my disposition at the hearing (SM 45-46). The defendants do not object and are wealthy. The class members are not now affected, whatever value is fixed. But the responsibility for a determination is that of the Court and after careful study, I cannot in good conscience find that the fair and reasonable value of Kohn's services is $2,000,000.

The problem in an antitrust context is perceptively discussed (and the principal cases collected) by Judge Metzner in Trans World Airlines, Inc. v. Hughes, 312 F.Supp. 478 (S.D.N.Y.1970), affirmed as part of a final judgment 449 F. 2d 51, 79 (2d Cir. 1971), cert. granted, 405 U.S. 915, 92 S.Ct. 960, 30 L.Ed.2d 785 (1972).

Judge Harvey on April 28, 1972 filed a careful opinion on the subject, which opinion among many others has been studied by me. Lindy Bros. etc. v. American Radiator etc., Civ. No. 41774SC (E. D.Pa.)

More recently on May 2, 1972, Judge Decker also filed a careful opinion on the subject and his opinion has also been studied by me. Illinois v. Harper & Row, 67 C 1899 (N.D.Ill.)

Our Court of Appeals in TWA v. Hughes, above, cited with approval the discussion in a District Court opinion on which Judge Metzner relied and from which he quoted, namely, Hanover Shoe, Inc. v. United Shoe Mach. Corp., 245 F.

Supp. 258, 302 (M.D.Pa.1965), vacated on other grounds, 377 F.2d 776 (3d Cir. 1967), aff'd in part on other grounds, rev'd in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In the District Court opinion just cited, Chief Judge Sheridan lists some of the factors to be considered as these:

"(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government,

(2) the standing of counsel at the bar—both counsel receiving the award and opposing counsel,

(3) time and labor spent,

(4) magnitude and complexity of the litigation,

(5) responsibility undertaken,

(6) the amount recovered,

(7) the knowledge the court has of the conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial,

(8) what it would be reasonable for counsel to charge a victorious plaintiff."

It may be noted that these factors were being applied in an action tried to the court without a jury where plaintiff was awarded substantial damages after trial. There is no mention of the factor of contingency of compensation which is one also to be considered where it exists.

The Code of Professional Responsibility of the American Bar Association states that factors "to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will pre-clude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

Whether mentioned specifically hereafter or not, I have tried to take into account the several factors referred to above.

102.

The time spent by the Kohn firm through March 24, 1972 is reported to be 1918 hours. Disregarding totals of less than 10 hours spent by a number of associates, the bulk of this time was spent by the following:

| | |
|---|---:|
| Mr. Kohn | 743 |
| Miss Korman | 1075 |
| Mr. Fine | 11 |
| Mr. Kaplan | 67 |
| | 1896 |

Mr. Kohn was admitted to the bar in 1938 and has a high standing at the bar, confirmed by his appearances before me.

Miss Korman was admitted to the bar in 1957.

Mr. Fine was admitted to the bar in 1949.

Mr. Kaplan was admitted to the bar in 1971.

The standing at the bar of the three last named is not known to me; it is assumed that they have a high standing appropriate to their experience at the bar. Information has been recently supplied showing that Miss Korman and

Mr. Kaplan had exceptionally good academic records and that Miss Korman has specialized in antitrust work and has had considerable experience in that field.

The time spent by the Berger firm through April 3, 1972 is reported to be 890 hours. Disregarding totals of less than 10 hours, the bulk of this time was spent by the following (the year in parentheses after the name is year of admission to the bar):

| | |
|---|---:|
| Mr. Berger (1938) | 152 |
| Mr. Newberg (1962) | 673 |
| Mr. Montague (1964) | 44 |
| Mr. Schambelan (1965) | 11 |
| | 880 |

Nothing is known by me as to the standing at the bar of the gentlemen just listed; it is assumed that they have a high standing appropriate to their experience at the bar.

The time shown includes time spent on all antibiotics cases except the Kent Pharmaceutical action, on which it is reported that the Kohn firm spent 133 hours.

The total time reported as spent by the Kohn and Berger firms on all antibiotics actions (including Kent Pharmaceutical) is thus 2941 hours. Of the 3000 hours [3] spent by the two firms, 1748 hours were spent by Miss Korman (admitted in 1957) and Mr. Newberg (admitted in 1962).

Some time will continue to be required on three of the actions, the City of Philadelphia action and the two hospital actions.

The time required in the City of Philadelphia action will be for distribution of the settlement fund to the class of consumers but most of the work in this regard has already been done, the plan of allocation having been filed December 28 last. Moreover the representation of consumers by the intervenor entities should never have been undertaken, because more appropriate and efficient representation was available.

The time which will be required in the two hospital actions is believed to be minimal because nothing is required from counsel in respect of distribution to the class.

For the reasons given, it appears that such further time as will be required of Kohn will not be significant in respect of the determination presently to be made.

In considering the time spent by the Kohn and Berger firms, there are some features to observe. Why two firms were needed instead of one has never been made to appear; duplication of efforts by counsel in class actions ought to be discouraged. What the division of labor, if any, was between the two firms has not been shown. I am not able to point to any contribution made by the Berger firm; my recollection of the paper record is that it reveals activity of the Berger firm only in respect of attempted interventions. As to such attempted interventions, hours spent in such work, whether by the Berger firm or the Kohn firm, ought to be disregarded because there was never any reason for it and, aside from any question of necessity, the work in connection with interventions was poorly performed. A considerable amount of time must have been spent in processing consumer claims; while this had to be done by somebody, it is not work requiring any great amount of professional skill.

103.

Counsel for all plaintiffs in all antibiotics actions had the benefit of extensive government investigations and proceedings, including the indictment returned on August 17, 1961 (see 314 F. Supp. at 714–720). Kohn in fact did not commence any actions until after the jury verdict of guilty. [The great help to the plaintiffs from the prior criminal and other government investigations to a great extent offsets the factor that the fee was contingent.]

104.

As already indicated, Kohn is accepted as an able and experienced antitrust

---

3. These being the 2941 hours rounded off to 3000 hours.

specialist who has a high standing at the bar. In the settlement negotiations resulting in the February 6, 1969 offers, Kohn "greatly helped", as stated above. But he did not by his own efforts bring about the settlement as to the CCS entities; he was among a number of the contributing causes. As to the February 6, 1969 private hospital settlement offer, Kohn advocated a settlement for this $20,000,000 offer; others later persuaded the defendants to offer $32,500,000.

The great help to the plaintiffs from the prior criminal and other government investigations is a reducing factor to be taken into account in determining the reasonableness of fees for counsel to plaintiffs in these and other similar actions (Code of Professional Responsibility, American Bar Association, Canon 2, EC–2–18, DR 2–106(B) (1)), just as the contingency of the compensation is an increasing factor also to be taken into account (Code of Professional Responsibility, American Bar Association, Canon 2, EC–2–18, DR 2–106(B) (8)).

Aside from the negotiations with defendants and the concepts employed in them, there appear to have been no novel or difficult questions to which the services of Kohn were addressed.

### 105.

The claims of the plaintiffs represented by Kohn were of considerable magnitude and their recovery under the settlements are substantial in amount.

In the City of Philadelphia action, the clients of Kohn will receive some $3,150,-000, less whatever is allowed for administrative expenses and for counsel fees and expenses.

In the private hospital cases, the clients of Kohn, it is estimated by him, will receive some $160,000, less allowances as above.

It is not shown how much was recovered by the clients of Kohn in the other actions in which he acted, but it is assumed for present purposes that the recoveries were, or will be, substantial.

Of course, the CCS entity actions in the aggregate involve the recovery of in excess of $80,000,000 and the private hospital actions in the aggregate involve the recovery of in excess of $21,000,000; these figures, however, are no proper measure of a fee to Kohn, if for no other reason because he did not himself create those funds; to the extent that he "greatly helped", this has been taken into account.

### 106.

The 25% contingent fee agreements to which Kohn was a party have been given consideration but they do not greatly affect my conclusion as to the fair and reasonable value of the services performed. The views expressed by Judge Decker in the *Harper & Row* opinion, above cited, seem to me to be correct:

"I have some difficulty accepting the premise that a contingent fee contract on a fixed percentage basis will ultimately result in a reasonable and fair fee because some of the plaintiffs have approved it. These contracts are entered into before any services have been performed and generally provide for a fixed percentage fee whenever a case is settled, without any reference to the quality of the services rendered or the time and effort required to effect the settlement. As the size of class action settlements increases, with millions of dollars involved in some cases, the fallacy of adhering to a fixed percentage fee formula becomes more evident."

■ It is determined that the fair and reasonable value of the services of Kohn is $600,000. This determination is believed to be within generous limits, considering, among other things, that it compensates at about $200 per hour for all hours spent by Kohn and the lawyers associated with him, without regard to the length of experience of each such lawyer—what Judge Metzner called the " 'mix' rate" (312 F.Supp. at 484). The value determined is for all services per-

formed by Kohn and his associates for all the "various plaintiffs" represented by him as counsel in the "certain antitrust cases" against defendants (the words in quotation marks are from the letter agreement of February 6, 1969).

Kohn has already been paid $361,000, rounding off the figures. He was paid $252,000 by plaintiffs and intervenors in the City of Philadelphia action in respect of recoveries by them on their own individual claims (that is, not as class members); he was paid $90,000 in the Kent Pharmaceuticals action (see (81) above); and he was paid $19,000 in the Hillman Medical Center and Hawaii Medical Services action (see (80) and (82) above). The payments to Kohn just noted were for professional services included within the $600,000 determination first above made.

If Kohn is paid $600,000 by defendants and retains the $361,000 already paid to him, he will be paid twice for the same services; in other words, he would be paid more than what has been determined to be the fair and reasonable value of his services. Whether the $361,000 should be deducted from the $600,000 determination before payment by defendants or whether the defendants should pay the $600,000 to Kohn is something which must be worked out between defendants and Kohn. If the defendants pay the $600,000 to Kohn, whether he should then keep all of it or not is for him to determine.

It is noted that Kohn expects to receive further fees from clients in these actions in the future. These receipts will involve the same problem of double payment which has just been noted. What, if anything, should be done to resolve such future problem must be worked out between defendants and Kohn.

From what has been here determined, it follows that no allowance will be made by me to Kohn from any fund to be distributed in any of these class actions. This is because the defendants are to pay him the fair and reasonable value of all his services.

If the parties desire an order to be entered on the foregoing determination, an order should be settled on notice before June 16, 1972.