ALPINE PHARMACY, INC., an Illinois Corporation, et al., Plaintiffs-Appellees,

v.

CHAS. PFIZER & CO., INC., et al., Defendants,

and

Cotler Drugs, Inc., et al., Plaintiffs-Appellants.

Nos. 852, 853 and 854, Dockets 73-1305, 73-1306 and 73-1308.

United States Court of Appeals, Second Circuit.

Argued May 7, 1973.

Decided July 2, 1973.

Edward A. Berman, Chicago, Ill. (Lawrence Walner, Lewis W. Schlifkin and Bernard B. Brody, Chicago, Ill., of counsel), for plaintiffs-appellants Cotler Drugs, Inc.

Harry Rubenstein, Chicago, Ill., for plaintiff-appellant Louis Patlogan, formerly d/b/a Patlogan's Western Pharmacy.

Myron Roschko, Beverly Hills, Cal. (Roschko & Rosenson, Beverly Hills, Cal.), on the brief for plaintiffs-appellants Domaro, Inc. and Benalen Corp.

Jay Erens, Chicago, Ill. (Levy & Erens, Richard F. Levy and Howard A. Tullman, Chicago, Ill., of counsel), for plaintiffs-appellees Alpine Pharmacy, Inc. and others by the Committee of Counsel.

David I. Shapiro, New York City (James vanR. Springer, Washington, D. C., of counsel), for Dickstein, Shapiro & Galligan.

Before SMITH, MULLIGAN and TIMBERS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is the latest, but we fear not the final, chapter in the ongoing saga of the antibiotic multidistrict antitrust litigation. The instant appeal is from an order of the United States District Court for the Southern District of New York, Inzer B. Wyatt, Judge, approving a plan of distribution to claimants in the retail and wholesale druggist class, and awarding attorneys' fees and expenses. For the reasons given below, we affirm in part and remand in part.

Since the background of the underlying litigation can charitably be described as complex, familiarity with the opinions of the district court and this court in State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, Cotler Drugs, Inc. v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), will be assumed. For the purposes of understanding the issues involved in the present appeal, the following skeletal history should suffice.[1]

1. For the benefit of the uninitiated, we include this thumbnail sketch of the history of this litigation.

The genesis was in 1951, when the Federal Trade Commission began an investigation of the pricing policies of Chas. Pfizer & Co. in the marketing of a broad spectrum antibiotic. This investigation eventually led to an FTC complaint against five corporate defendants, which in turn led, in 1963, to a Commission cease and desist order. That order was vacated by the Sixth Circuit, 363 F.2d 757 (1966) and the cause remanded to the Commission. The FTC again found antitrust violations, and this time the order was enforced, 401 F.2d 574 (6th Cir. 1968), cert. denied 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969).

In 1961, a criminal indictment was returned in the Southern District of New York, charging a number of individual and corporate defendants with Sherman Act violations. Judge Ryan later dismissed the indictment as to the individual defendants, 245 F.Supp. 801 (1965). After a motion to dismiss by the corporate defendants was denied, 281 F.Supp. 837

(1968), judgments of conviction resulted on jury verdicts of guilt. The convictions were reversed on appeal, 426 F.2d 32 (2d Cir.), panel opinion supplemented and order granting rehearing en banc vacated, 437 F.2d 957 (2d Cir. 1970), aff'd by an equally divided court, 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1972).

The civil complaints followed hard on the heels of the FTC and criminal investigations. Through a series of orders, the Judicial Panel on Multidistrict Litigation consolidated these actions and transferred them to Judge Wyatt. See 295 F.Supp. 1402; 297 F.Supp. 1126; 299 F.Supp. 1403; 301 F.Supp. 1158; 303 F.Supp. 1056; 309 F.Supp. 155.

State of West Virginia v. Chas. Pfizer, supra, involved a compromise of the class claims of wholesaler-retailer druggist class, the individual consumer class, and the government entity class. In Hartford Hospital v. Chas. Pfizer & Co., 52 F.R.D. 131 (S.D.N.Y.), aff'd mem. 448 F.2d 790 (2d Cir. 1971), a compromise was approved involving private hospitals and Blue Cross Plans. See also City of

The underlying suit involves antitrust allegations directed against five corporate defendants, concerning the marketing of broad spectrum antibiotic "wonder drugs." Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated a number of such actions in the Southern District of New York, assigning them to Judge Wyatt. The plaintiffs in these suits fall into a number of groups, but only three classes of claimants are relevant here: (a) city, county, and state government entities (the CCS plaintiffs), whose claims arise out of either the direct purchases of antibiotics or out of payments to or for the benefit of recipients of public aid; (b) wholesale and retail druggists (hereinafter, for simplicity, termed the retailer class); and (c) individual consumers.

Before the underlying action could proceed to trial, the defendants made a settlement offer in the amount of $100,000,000 as to the claims of these three groups. The CCS plaintiffs were to get $60 million; the remaining $40 million was to be divided between the claims of the retailer class and individual consumers. At the outset, many of the plaintiffs were of the view that the retailer class should get nothing at all, since the members of this class sold nearly all of the antibiotics which they purchased to consumers on the basis of cost plus a fixed markup, which resulted in their actually making higher profits as a result of the alleged antitrust violations. However, a "nuisance value" settlement of $3 million was eventually allocated to this class, in order to secure their agreement to the settlement. The remaining $37 million was to go to the claims of consumers.[2]

After a number of CCS plaintiffs chose to opt out of the "global settlement," the settlement offer was adjusted downward to $82,615,030.[3] The only group which raised serious objections to the final plan was the retailer class, which contended that it was entitled to the entire $37 million going to consumers. After extensive negotiations, the parties arrived at the novel solution of placing the entire settlement fund in escrow, with the interest on the account to accrue to the benefit of the retailer class. The escrow was to continue until there was a final order approving the compromise.

There was no such order until the end of the *State of West Virginia* case, which involved attacks on the settlement offer by some disgruntled members of the retailer class. By the time Judge Wyatt entered the order appealed from

*Philadelphia v. Chas. Pfizer & Co.*, 345 F.Supp. 454 (S.D.N.Y.1972), involving the award of attorneys' fees in that compromise.

Those plaintiffs who continued to litigate their claims then had their actions consolidated by the Multidistrict Panel, 320 F.Supp. 586 (1970), and assigned to Judge Lord of the District of Minnesota, sitting in the Southern District of New York. Judge Lord then issued a series of orders governing these actions, reported at 333 F.Supp. 267–324 (1971), including one transferring the cases to Minnesota. We denied a petition of mandamus seeking to overturn that order, 447 F.2d 122 (2d Cir. 1971). *See also*, 449 F.2d 119 (2d Cir. 1971) (denying a mandamus petition directed at Judge Lord's order of notice); 450 F.2d 1119 (2d Cir. 1971), aff'g mem. 333 F.Supp. 296 (S.D.N.Y.) (Judge Lord's dismissal of various claims as barred by the prior judgment).

For the further adventures of the case after its transfer to Minnesota, *see* 456 F.2d 532 (8th Cir. 1972) (denying motion to recuse Judge Lord); 456 F.2d 545 (8th Cir. 1972) (granting mandamus petition directed toward discovery orders.)

2. Individual claims totaling about $16.5 million had been filed by some 38,000 consumers. After these were settled, the balance of the $37 million was to be retained by the attorneys general of the various plaintiff-states, as representatives of the individual consumers, to be disbursed in whatever manner the district court directed. *See* 440 F.2d at 1083–1084 and 1089–1091.

3. No adjustment was made for wholesaler-retailers or for consumer class members who chose exclusion. 440 F.2d at 1084.

here, the total amount to be distributed to the retailer class, including both the basic $3 million share and the escrow interest, was $12,685,018.

It was this "pot" which Judge Wyatt sought to divide below, after making deductions for the expenses of administration, counsel fees and expenses of counsel. Before proceeding to the merits, we should note that the bulk of Judge Wyatt's distribution order has not been appealed. We are asked today only to review the claim of two class members to additional damages, and a number of contentions concerning the distribution of attorneys' fees.

### I.

Out of the more than 4400 class claimants, only two have objected to the amount of settlement funds allocated them. Before treating the merits of these objections, we cannot help but note that the virtual unanimity with which the retailer class accepted the settlement allocations stands as tribute to what we recently termed "Judge Wyatt's extraordinary feat of judicial administration" in handling these cases. Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (1973). That feat is in no way marred by the two claims here, which, for the reasons outlined below, we find to be without merit.

The two objecting class members are Domaro, Inc., and Benalen Corporation. They both complain about Judge Wyatt's refusal to award them "special damages." Each claimed that it had refused to buy antibiotics from the defendants, ostensibly because of the antitrust violations, and thus went to Italy for "wonder drugs." However, domestic customers, who were fearful of infringing the patent arrangements of the defendants, allegedly would not buy from Domaro and Benalen. Hence the "special damages" claim for amounts over and above the figures Judge Wyatt allotted, the latter being arrived at by simply multiplying the total dollar amounts of anti-

biotics purchased from the defendants times a fixed percentage.

While it seems likely to us that the only manageable way of allocating the settlement funds was through such a formula, ignoring the specialized claims of individual class members, we need not so decide in this instance. The record indicates that the original claims submitted by Domaro and Benalen, in August of 1969, inexplicably failed to mention the European purchases theory of "special damages." It was not until over two and one-half years later, at a hearing held to consider the Amended Second Stage Plan of Allocation, that appellants sought to press this claim upon the district court. Judge Wyatt told appellants at that time of the great difficulties caused by accepting late damage claims, and eventually limited these class members, as all others, to damages measured by the formula outlined above.

We are convinced that the late nature of the claims alone here justifies affirmance. As Judge Wyatt noted, when there are over 4400 claims on file, those who develop late theories about "special damages" do so at their peril. Thus, even putting to one side the rather speculative nature of the claims at hand, we find no error in Judge Wyatt's handling of them.

### II.

The remaining contentions center on Judge Wyatt's decisions with respect to the awarding of counsel fees. Few subjects associated with the class action device have generated as much critical commentary in recent years as the matter of attorneys' fees. See e. g., State of Illinois v. Harper & Row Publishers, Inc., 55 F.R.D. 221 (N.D.Ill.1972); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1803 (1972 Supp.); Manual for Complex and Multidistrict Litigation § 1.47 (1973 rev.); Comment, Attorneys' Fees in Individual and Class Action Antitrust Litigation, 60 Cal.L. Rev. 1656 (1972); Handler, The Shift

from Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review, 71 Colum.L.Rev. 1, 9–10 (1971). As Judge Decker has wryly put it, the lucrative fees involved in recent class actions may evoke public acceptance of an Italian proverb, "A lawsuit is a fruit tree planted in a lawyer's garden." State of Illinois v. Harper & Row, *supra*, 55 F.R.D. at 224.

■ As the recently revised Manual for Complex and Multidistrict Litigation suggests, there are several competing considerations at work in the award of class action counsel fees. One accepting employment as counsel in a class action does not become a class representative through simple operation of the private enterprise system. Rather, both the class determination and designation of counsel as class representative come through judicial determinations, and the attorney so benefited serves in something of a position of public trust. Consequently, he shares with the court the burden of protecting the class action device against public apprehensions that it encourages strike suits and excessive attorneys' fees. *See* 7A C. Wright & A. Miller, *supra,* at § 1803.

■ On the other hand, few would dispute the basic proposition that one whose labors produce a favorable result deserves adequate recompense. Such a notion is particularly applicable in the area of the antitrust class action, which depends heavily on the notion of the private attorney general as the vindicator of the public policy. *See, e. g.,* Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation.

■ Balancing these competing interests is peculiarly a job for the district court, which is the forum most familiar with the particular equities in an individual instance. Consequently, it is by now a matter of faith that attorneys' fees are a matter left to the reasonable discretion of the trial judge. *See* 7A C. Wright & A. Miller, *supra,* at § 1803 and cases cited therein. But that discretion is not absolute, and courts of appeal have not hesitated, in appropriate instances, either to modify fee awards, *see, e. g.,* United States v. American Society of Composers, 466 F.2d 917 (2d Cir. 1972); Freeman v. Ryan, 133 U.S. App.D.C. 1, 408 F.2d 1204 (1968); Green v. Transitron Electronic Corp., 326 F.2d 492 (1st Cir. 1964), or to remand a case for reconsideration and further findings to the district court, *see, e. g.,* Angoff v. Goldfine, 270 F.2d 185 (1st Cir. 1959).

■ The general factors to be considered in awarding counsel fees were extensively reviewed by Judge Wyatt in City of Philadelphia v. Chas. Pfizer & Co., 345 F.Supp. 454, 482–483 (S.D.N.Y.1972), a discussion that was incorporated by reference into the opinion below. The antitrust cases have identified as relevant such considerations as: (1) the standing of the counsel at the bar; (2) time and labor spent; (3) complexity of the litigation; (4) the amount recovered; (5) the responsibility undertaken; (6) the court's knowledge of the amount and quality of the work done; (7) what it would be reasonable for counsel to charge a victorious plaintiff; and (8) whether or not counsel had the benefit of a prior decree in a Government-brought case. *See* Hanover Shoe, Inc. v. United Shoe Mach. Corp., 245 F. Supp. 258, 302 (M.D.Pa.1965), vacated on other grounds, 377 F.2d 776 (3rd Cir. 1967), aff'd in part and rev'd in part on other grounds, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); Trans World Airlines v. Hughes, 312 F.Supp. 478 (S.D.N.Y.1970), aff'd, 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). In addition, as Judge Wyatt made note in the City of Philadelphia opinion, the Code of Professional Responsibility of the American Bar As-

sociation states a number of related considerations, including the contingent nature of the fee expectancy, which also may be taken into account. And, of course, the standards, outlined above, of revised § 1.47 of the Multidistrict Manual are especially relevant to the awarding of counsel fees in a case like this.

But, as a number of courts have recently recognized, factors such as those related above, while helpful, can serve only as guides, not as precise yardsticks. *See* Comment, Attorneys' Fees in Individual and Class Action Anti-trust Litigation, *supra,* at 1667–68 & n. 66, and cases cited therein. In the end, no mathematical formula, or precise weighing of specific factors is necessary, nor even desirable. In fact, there is no requirement that each of the listed criteria be taken into account, only that the final award be reasonable under the circumstances of the case.

As one commentator has noted, "there are nearly as many notions of what is reasonable as there are judges." Clark, The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits, 52 Mich.L.Rev. 363, 412 (1954) It is an inevitable corollary of that observation that a reviewing court can only perform its functions, however limited, by looking at the facts of the case at hand to determine whether the district judge did in fact act reasonably. Consequently, it is to those facts which we now turn.

### A.

After the basic settlement offer in this case was accepted in principle by nearly all of the plaintiffs to whom it was addressed, Judge Wyatt, on May 26, 1969, ordered that the actions commenced by wholesale and retail druggists be consolidated as the "consolidated wholesaler-retailer class action." There were thirteen such individual actions; the class was specified to be all purchasers of broad spectrum antibiotics who bought for resale at wholesale or retail. The May 26 order further provided that the class was to be represented by a "Committee of Counsel," comprised of all counsel of record in the thirteen actions.

It was this Committee which undertook the overwhelming bulk of the relevant legal labors in this case. The Committee not only took part in the extensive settlement negotiations and the bargaining that led to the escrow idea, but also participated fully in the judicial proceedings, both in the district court and on appeal, that resulted in the ultimate approval of the settlement. After the approval, it was the Committee which bore the brunt of administering the processing of the claims of class members, and developing a plan of allocation.

At the time of the fee petitions here, the Committee consisted of nine active law firms.[4] The Committee requested a total of $4 million in counsel fees, or about 32% of the total recovery. The nine Committee members then agreed among themselves as to an allocation of that sum, representing that their agreement was an evaluative consensus of the work done.

Judge Wyatt disposed of the issue of fee awards to the Committee in rather summary fashion in his otherwise extensive opinion below. He briefly noted that he had numerous papers and supporting affidavits before him on the issue of counsel fees, and then stated that he had set out the appropriate factors with regard to such awards in his *City of Philadelphia* opinion, 345 F.Supp. at 482–483 and would not repeat them. The following constitutes the entire bal-

---

4. Judge Wyatt denied the counsel fee applications of Dene L. Lusby and Donald B. Brown, both of whom had been members of the original Committee, holding that they did not contribute to any of the group's activities. Neither has appealed.
 The claims of another set of counsel on the original Committee, the representatives of Cotler Drugs, Inc., are dealt with at some length in part II C, *infra.*

ance of the district judge's treatment of the Committee fee petitions:

"There are a number of factors which suggest a generous allowance, the chief of which is the result accomplished (especially the increase by way of interest). There are a number of factors which suggest a modest allowance, for example, that the government and other plaintiffs pioneered the claims, that the considerable time spent in processing claims of class members did not require a high degree of professional skill, and that there was extensive duplication of effort (nine law firms on the Committee, two of which acted in the same action).

The list below shows the amounts asked for counsel fees, the amounts allowed for counsel fees, and the amounts allowed for expenses of counsel (these are the same as the amounts asked):

| Name | Fees Asked | Fees Allowed | Expenses Allowed |
|---|---|---|---|
| Levy and Erens<br>208 South LaSalle Street<br>Chicago, Illinois 60604 | $ 965,000 | $ 470,000 | $ 13,144.84 |
| Schwartz & Alschuler<br>880 Century Park East<br>Los Angeles, California 90067 | 840,000 | 370,000 | 29,308.36 |
| Jerome S. Wald<br>100 West Monroe Street<br>Chicago, Illinois 60603 | 484,000 | 290,000 | 7,000.61 |
| James P. Chapman<br>Peter A. Loutos<br>James B. Sloan<br>39 South LaSalle Street<br>Chicago, Illinois 60603 | 452,000 | 240,000 | 12,579.03 |
| Cochrane & Bresnahan, P.A.<br>830 Minnesota Building<br>St. Paul, Minnesota 55101 | 328,000 | 140,000 | 7,119.86 |
| Chestnut, Brooks & Burkard<br>854 Midland Bank Bldg.<br>Minneapolis, Minnesota 55401 | 296,000 | 115,000 | 10,679.19 |
| Peck, Shaffer & Williams<br>1604 First National Bank Bldg.<br>Cincinnati, Ohio 45212 | 260,000 | 115,000 | 23,928.84 |
| Leo Schwartz<br>20 Beacon Street<br>Boston, Massachusetts 02108 | 300,000 | 145,000 | 11,417.38 |
| Sager & Burns<br>19 West Flagler Street<br>Miami, Florida 33130 | 200,000 | 75,000 | 8,020.92 |
| TOTAL | $4,125,000 | $1,960,000 | $123,199.03" |

Several appellants have claimed that the $1,960,000 total award is excessive, and constitutes an abuse of the district court's discretion. We cannot agree. Whether the award is viewed in relation to either the total recovery of

over $12.5 million or merely in relation to the interest added by the escrow arrangement,[5] the total falls well within the range of attorneys' fees awarded in previous antitrust actions. *See* the cases cited in Comment, *supra*, 60 Cal.L. Rev. at 1679–82; Lindy Bros. Bldrs. Inc. v. American Radiator and Standard Sanitary Corp., 341 F.Supp. 1077, 1089–1092 (E.D.Pa.1972); Hanover Shoe, *supra*, 245 F.Supp. at 302–304 & n. 18; *see also* Hornstein, Legal Therapeutics: The Salvage Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658 (1956). In addition to the favorable results achieved here, we are confident that Judge Wyatt was familiar with both the quality and quantity of work done by the Committee, and with the abilities of the counsel. Under all these circumstances, we do not view the total award as abuse of discretion.

Nevertheless, we are troubled by a related problem—the division of the total award among Committee members. We have been unable to discover, either from Judge Wyatt's opinion or from the record, any rationale to explain the precise distribution adopted. The final awards bear no discernible relationship to those requested, nor does there appear to be any simple correlation, mathematical or otherwise, applicable to the amounts granted the various Committee counsel.

On the rather vague state of the record, we find ourselves unable to deal with the contentions of several of the appellants that the Committee fee distribution is arbitrary and unfairly rewards certain firms. Indeed, we find striking the contrast between the sparse discussion below on this point and Judge Wyatt's comprehensive balancing of various relevant factors in arriving at fee awards in the *City of Philadelphia* case.

We do not imply that Judge Wyatt arrived at the individual breakdown in an erroneous manner. Indeed, the absence of any simple mathematical correlation between the various sums requested and those awarded suggest precisely the contrary—that each award was determined through careful consideration of the individual merits of each claim. Nor do we suggest that the district court— which is quite familiar with the history of this case and had before it ample supporting papers—must necessarily hold an evidentiary hearing in this case.[6] *See* Lindy Bros. Bldrs. Inc., *supra*, 341 F.Supp. at 1083. All that we require is some explanation for the ultimate breakdown of the Committee award.

■ To be sure, many appropriate reasons governing the various distributions come to mind—disparities in hours worked, comparative standing at the bar of lawyers involved, differences in results achieved or types of work done, to name but a few. We cannot accept the suggestion of some appellants that a single precise formulation must be developed and applied unswervingly. But until the district court articulates some basis for the distribution of the Committee award, we are left to speculate as to its reasoning. Such speculation is inconsistent with even our limited review role here, so we remand the issue of the Committee fee award to the district court for further consideration and findings consistent with what we have said above.

### B.

The district court's refusal to award attorney's fees to Harry Rubenstein presents far fewer difficulties. We conclude that Judge Wyatt plainly did not err here, and affirm.

Rubenstein represented a single class claimant, one Louis Patlogan, whose final portion of the settlement approximates $200. Patlogan never filed an in-

---

5. We phrase the question alternatively because of Judge Wyatt's holding that the law firm of Dickstein, Shapiro & Galligan was chiefly responsible for the creation of the initial $3 million fund. See part II D, *infra*.

6. Of course, we do not wish to preclude such a hearing, should the district court deem it advisable.

dividual action before the class consolidation; Rubenstein was consequently not a Committee member. Thus, while Rubenstein continually appeared in the proceedings below, see Fed.R.Civ.P. 23(c)(2)(C), he rather clearly did so on behalf of his client, not the class. By his own account, Rubenstein had nothing to do with either the basic settlement or escrow fund negotiations.

Nonetheless, Rubenstein seeks over $75,000 in counsel fees and costs. He makes two arguments. The first involves the fact that he and others initiated the appeal from Judge Wyatt's approval of the settlement offer, which, by preventing the settlement from becoming final, added about $650,000 in escrow interest to the wholesaler-retailer share of the final total. Rubenstein claims a substantial award for conferring this benefit upon the class.

We do not think that Judge Wyatt abused his discretion in rejecting this argument. True, as we noted in our previous opinion, 440 F.2d at 1091–1092, the appeal did add funds to the class share. And, despite some suggestions to the contrary, we were unable to find that the appeal was motivated by bad faith. Id. at 1092. But it does not necessarily follow that those who took the appeal must inexorably be the beneficiaries of consequent attorneys' fees.

■ As the district judge noted, the CCS plaintiffs, alarmed by the delay inherent in the appeals process, offered to turn over the $650,000 in interest to the wholesaler-retailer class if the proceeding were withdrawn. Rubenstein and the others rejected that offer and continued to prosecute the appeal, a course which, both in Judge Wyatt's view and ours, was quite probably not in the best interests of the class. On April 16, 1970, this court had reversed the criminal convictions that had been suffered by the defendants here.[7] If the appeal, which was taken after that date, had ultimately been successful and had overturned the settlement, the defendants, without the impetus of the criminal convictions, might well have walked away from the whole deal. Since the appeal at least exposed the class to that danger, Judge Wyatt did not abuse his discretion in refusing to award Rubenstein for it.

■ Rubenstein's second argument is that he deserves counsel fees for proving, in the unrelated Ampicillin cases, see In re Ampicillin Antitrust Litigation, 315 F.Supp. 317 (Jud.Panel on Mult.Lit.1970); 55 F.R.D. 269 (D.D.C. 1972), that retail druggists do not uniformly take a 66⅔% markup on antibiotics. Even taking the rather large step of assuming the factual contention to be true, we are unable to perceive how this revelation is of any benefit to the class in this case.[8] The class fund here is not a pot out of which all those who generally further the cause of druggists in our society are to be rewarded. In the absence of even the hint of a showing of some benefit to the class in this case, Rubenstein has no real claim to attorneys' fees.[9]

### C.

Edward A. Berman, Lewis W. Schifkin, Lawrence Walner, Bernard B. Brody, Edward R. Johnston, and Jenner & Block, all of Chicago, who acted as counsel to Cotler Drugs, Inc., a plaintiff in one of the thirteen consolidated actions, have attacked as inadequate their attorneys' fee award of $75,000. Evaluation

---

7. See the chronology in note 1, supra.

8. Indeed, both the district court, 314 F. Supp. at 745, and this court, 440 F.2d at 1088, seemed to assume the correctness of the 66⅔% figure in approving the compromise of the retailer class' claims.

9. We regard as frivolous Rubenstein's various claims that, because two members of this panel sat on the State of West Virginia appeal, a new panel should be convened to hear this case. While any legally sufficient excuse for avoiding the rather complicated issues here might be welcomed, Rubenstein has provided us with none.

of the claims of these appellants (hereinafter Cotler counsel) requires a brief recapping of some of the history of this suit.

Cotler counsel, as representatives of one of the original thirteen plaintiffs, were designated members of the Committee of Counsel. Cotler counsel apparently had a number of disagreements with other members of the Committee, stemming not only from their original opposition to the settlement proposal, but also from their motion to have Cotler Drugs designated as the sole class representative and their continued insistence that the retailer class receive the entire $40 million allocated to non-CCS plaintiffs. These disagreements eventually led, on March 2, 1970, to ˇCotler counsel being "relieved temporarily of their duties as members of the Committee" by court order. It seems uncontested that they took no part in any of the Committee work after that date, although, as class representatives, they did appear frequently and argued their views to the district court. Cotler counsel were, along with Rubenstein, the prime architects of the appeal of Judge Wyatt's approval of the settlement proposal.

Cotler counsel originally sought attorneys' fees of $512,000. It seems clear to us that the figure is grossly excessive. First, the total was in part based on a claim for $162,500 (25% of $650,000) for the taking of the appeal from the settlement approval. For the reasons we outlined in rejecting Rubenstein's identical claim, we hold that Judge Wyatt did not err in refusing to accept this argument. Moreover, the balance of the fee request, $350,000, was arrived at not only by an overestimation of the total

Committee award and some dubious arithmetic, but also by assuming that Cotler counsel, despite the March 2 order, deserved a full proportionate share of whatever the Committee received.[10]

As Judge Wyatt correctly noted, there are ample reasons in the record for denying Cotler counsel treatment equal to the other active Committee members. For one thing, Cotler counsel took no part in the Committee work after March 2, including the development of the plans of allocation and the processing of claims. For another, Judge Wyatt noted below that virtually all the arguments offered by counsel on behalf of the class were rejected. True, the presentation of dissident views should not in itself lead to the rejection of fee requests, but we find it difficult to view an award of $75,000 as stifling dissent. *Compare* Ace Heating & Plumbing Co. v. Crane, 453 F.2d 30 (3rd Cir. 1971), where a district court order that had denied any fees to a dissident counsel was modified to allow a $3000 award, one-tenth of that requested.

 In short, we are unable to view the $75,000 award as either shocking or arbitrary under the circumstances. Indeed, if the Cotler appeal were the only one before us, we might well affirm. But, in view of our decision to remand the Committee fee awards for further findings, we have, in an excess of caution, decided upon a remand here also. To the extent, if any, that further findings on the Committee division issue lead to reconsideration of the amount of those awards, we think it fair that the district judge have an opportunity to view the Cotler situation in that new light. Moreover, we are slightly troubled by Cotler counsel's allegations that

10. Cotler counsel arrived at the $350,000 figure by estimating a Committee fee award of $2.75 million, and then dividing that figure by nine. Of course, the eventual total award of counsel fees to the Committee were less substantial. Moreover, it would seem that if Cotler counsel were to be included, the relevant number of law firms on the Committee to be given attorneys' fees would be ten, not nine.

the district judge erred in holding that they took no part in the negotiations leading to the creation of the escrow fund. While it is true that certain portions of Cotler counsel's fee petition indicate this to be true,[11] it is also true that appellants were full members of the Committee during this time period, and at least some Committee members have viewed the escrow idea as resulting from the efforts of the "whole Committee." [12] There may well be no real factual conflict here, but in view of the necessity of a remand on the Committee issue, which may well lead to a more detailed look at the contributions of the individual members to the end result, we think it appropriate to remand the Cotler award also.

### D.

All appellants have attacked Judge Wyatt's award of $350,000 in counsel fees to the law firm of Dickstein, Shapiro & Galligan (hereinafter Shapiro). For the reasons set out below, we find that the district judge did not abuse his discretion, and affirm the award.

The unusual aspect of the Shapiro situation, as Judge Wyatt recognized below, is that the firm did not act as counsel to any of the wholesaler-retailer plaintiffs. Rather, Shapiro was counsel to about twenty CCS plaintiffs at the time the February 6, 1969, "global settlement" offer was made; the firm later acted as counsel to a number of other CCS entities.

The factual background of the Shapiro firm's participation in the settlement process is set out at length both in the opinion below and Judge Wyatt's

prior *City of Philadelphia* opinion. It was this firm, acting chiefly through David I. Shapiro, which was the chief negotiator of the February 6, 1969, global settlement offer. That offer did not allocate specific sums to the various classes of claimants; it had in mind only that the claims of the consumer class, the CCS entities, and the wholesaler-retailer class would be encompassed in the settlement. No counsel for the wholesaler-retailer claimants took part in the negotiations leading up to the global settlement offer.

After the offer was made, Shapiro worked to gain acceptance of it by counsel for the various wholesaler-retailer plaintiffs. He proposed that the retailer class be allocated $3 million of the $100 million offer; when asked if he would seek a fee from this allocation Shapiro stated that he would not, if the proposal were then accepted. Counsel for the wholesaler-retailer plaintiffs eventually accepted the global offer, but did not accept the $3 million proposal.

The May 26, 1969, consolidation order followed. In the subsequent negotiations over the precise allocation of the settlement fund, a number of CCS entities took the position that the retailer class should receive nothing from the settlement fund, since they had "passed on" any increased prices to the eventual consumers. The Committee of Counsel, on the other hand, filed an allocation plan with the district court demanding $40 million. Shapiro, who filed a $3 million proposal, informed the Committee that he was opposed to their plan, and that if defendants eventually adopted the $3 million suggestion, he would

11. The Cotler fee petition notes that the escrow idea was "unveiled" at a meeting of the Committee on October 2–3, 1969. Yet the fee application of Dickstein, Shapiro & Galligan reveals that David I. Shapiro, at least, had been informed of the escrow proposal as early as September 26, 1969. This would at least imply non-participation by Cotler counsel in the formulation of the escrow plan.

12. Compare the treatment of the Committee petition, where Judge Wyatt did not undertake to outline the contributions, or lack thereof, of any individual member to the escrow negotiations.

feel justified in seeking a counsel fee for creating that fund. Several other plans filed by CCS entities, as might be expected, allocated nothing to the whole-saler-retailer class.

Shapiro then took part in negotiations with both the defendants and with the Committee aimed at satisfying the retailer class. It was out of these negotiations that the basic compromise arose—an allocation of $3 million to the class, plus the interest from the escrow account.

Shapiro did not claim credit for the latter idea, preferring to credit the efforts of the Committee. He did, however, argue to the district judge that it was his efforts that were responsible to the basic $3 million allocation, and sought 25% of that sum, or $750,000, in attorneys' fees.

Judge Wyatt found that "[i]t is certain that the efforts of Shapiro were largely responsible for the creation of the $3,000,000 fund allocated to the retailer class." He concluded that it was only fair that those who benefited from the firm's efforts ought to contribute to the allowance to counsel, and thus awarded the Shapiro firm $350,000 out of the class fund.

Appellants contend that since Shapiro was the lead counsel for the CCS entities, and thus an "adversary" of the retailer class, that no such counsel fees award can be made. While it is true that Shapiro did not represent any wholesaler-retailer class members, the court's power to make an attorneys' fee award under these circumstances seems clear from Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184 (1939), and its progeny. In *Ticonic Bank*, Mr. Justice Frankfurter recognized the historic powers of the equity court to allow counsel fees and costs to a party whose efforts result in the creation of a fund that benefits others. That equity power was not limited mere-ly because the benefited party did not sue on behalf of the eventual fund beneficiaries. As the Court put it, 307 U.S. at 167, 59 S.Ct. at 780:

> "Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation."

Since Judge Wyatt gave Shapiro credit for creating the fund that benefits the wholesaler-retailer class here, the fact that the firm did not sue on behalf of that class presents no bar to an allowance out of the fund. *See also* United States v. American Society of Composers, 466 F.2d 917 (2d Cir. 1972). Nor does the characterization of the CCS entities as "adversaries" of the retailer class compel a different result. O'Hara v. Oakland County, 136 F.2d 152 (6th Cir. 1943). The relevant factor is the creation of the fund, not what Justice Frankfurther termed "the formalities of the litigation."

Nor do we find compelling appellants' unsubstantiated contentions that Shapiro did not in fact play a large role in creating the fund. As noted above, both the opinion below and the *City of Philadelphia* opinion describe Shapiro's contributions in great detail, and we could hardly undertake to dispute Judge Wyatt's familiarity with the history of these actions. Given the rather ample record below, the voluminous supporting papers, and Judge Wyatt's personal involvement in much of this case, the holding of an evidentiary hearing was not necessary. *See Lindy Bros., supra.*

In short, we find no error in the Shapiro award, and affirm this part of the judgment below.[13]

**E.**

After determining the fee awards to the Committee, Judge Wyatt dealt with several claimed expenses of that group which were asked to be charged against the settlement fund. These items, listed under headings 14a through 14d in the opinion below, ranged from a bill from a law firm for tax advice to payments for computer services. As Judge Wyatt recognized, each item was inadequately explained by the Committee. Because the district judge thought it critical to avoid delay in distribution of the class fund, he felt it necessary to accept these items "on faith."

Since a remand is necessary for other reasons, we think it proper that these expense items be explained to the district court by the Committee. While we have no reason to believe that any of these are anything but properly claimed, they do total about $62,000, a not insignificant sum even in this litigation. On remand, the district court should satisfy itself as to their necessity.

**III.**

In summary then, we affirm (1) the district court's denial of "special damages" to Domaro and Benalen; (2) the denial of counsel fees to Harry Rubenstein; and (3) the award of such fees to the Shapiro firm. We remand for further proceedings the matters of (1) the counsel fees of the Committee of Counsel; (2) the objections of Cotler counsel to their fee award; and (3) the various expense items taken "on faith."

13. We do not read any of the appellants' briefs as challenging the amount of the award, probably because the thrust of their arguments goes to the power of the court to give attorneys' fees to the Shapiro firm at all. Given Judge Wyatt's finding

that Shapiro was chiefly responsible for creation of a $3 million fund, we are unable to view an award of $350,000, or slightly over 10% of the fund, as an abuse of discretion.